## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____ )
BAKERY AND CONFECTIONERY UNION AND )
INDUSTRY INTERNATIONAL PENSION FUND and )
TRUSTEES OF THE BAKERY AND )
CONFECTIONERY UNION AND INDUSTRY )
INTERNATIONAL PENSION FUND, )
                                          )
                    *Plaintiffs*,         )
                                          )
            v.                            ) Civil Action No.  20-9894
                                          )
ZARO BAKE SHOP, INC., ANJOST CORP., and   )
138 BRUCKNER BLVD. ASSOCIATES, LLC,       )
                                          )
                    *Defendants*.         )
_____ )

## **COMPLAINT**

### Introduction

1.      This is an action to collect delinquent contributions and withdrawal liability that Defendants owe to Plaintiffs and to enforce Defendants' obligation to provide information requested by Plaintiffs for the purpose of verifying that all required contributions have been remitted to Plaintiff Bakery and Confectionery Union and Industry International Pension Fund. The action is brought pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 (hereinafter "ERISA").

### Jurisdiction and Venue

2.      The Court has subject-matter jurisdiction of this action under Sections 502 and 4301(c) of ERISA, 29 U.S.C. §§ 1132 and 1451(c).

3.      Venue is properly laid in this Court pursuant to Sections 502(e)(2) and 4301(d) of ERISA, 29 U.S.C. §§ 1132(e)(2) and 1451(d), because Defendants reside and/or do business in this District.

Parties

4.      Plaintiff Bakery and Confectionery Union and Industry International Pension Fund (hereinafter referred to as the "Pension Fund" or the "Fund") is a trust fund established and maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 186(c)(5).  The Pension Fund is an employee benefit plan within the meaning of Sections 3(2) and 3(3) of ERISA, 29 U.S.C. § 1002(2) and (3), and is maintained for the purpose of providing retirement and related benefits to eligible employees of participating employers. The Pension Fund is also a multiemployer pension plan within the meaning of Sections 3(37)(A) and 4001(a)(3) of ERISA, 29 U.S.C. §§ 1002(37)(A) and 1301(a)(3).  It was established and is maintained pursuant to an Agreement and Declaration of Trust, most recently amended through June 30, 2009 ("Trust Agreement").

5.      Plaintiff Trustees of the Bakery and Confectionery Union and Industry International Pension Fund (hereinafter referred to as "Plaintiff Trustees") are fiduciaries within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and are the plan sponsor of the Pension Fund within the meaning of Section 3(16)(B) of ERISA, 29 U.S.C. § 1002(16)(B).

6.      All plaintiffs maintain their principal place of business at 10401 Connecticut Avenue, Kensington, Maryland 20895.  Plaintiff Pension Fund is administered at that location.

7.      Plaintiffs bring this action on behalf of themselves and the Fund's participants and beneficiaries pursuant to sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145.

8.      Defendant Zaro Bake Shop, Inc. (hereinafter referred to as "Zaro") is a business engaged in the production of baked goods. It is an employer in an industry affecting commerce within the meaning of Sections 3(5), 3(11), 3(12), and 4(a)(1) of ERISA, 29 U.S.C. §§ 1002(5), (11), (12), and 1003(a)(1).

9.      Zaro's principal business location is 138 Bruckner Boulevard, Bronx, New York 10454.

10.     Zaro's chief executive officer and contact person for service of process through the New York Department of State is Stuart D. Zaro.

11.     Defendant Anjost Corp. (hereinafter referred to as "Anjost") is a business engaged in the production of baked goods. It is an employer in an industry affecting commerce within the meaning of Sections 3(5), 3(11), 3(12), and 4(a)(1) of ERISA, 29 U.S.C. §§ 1002(5), (11), (12), and 1003(a)(1).

12.     Anjost's principal business location is 138 Bruckner Boulevard, Bronx, New York 10454.

13.     Anjost's chief executive officer and contact person for service of process through the New York Department of State is Stuart D. Zaro.

14.     Defendant 138 Bruckner Blvd. Associates, LLC (hereinafter referred to as "Bruckner") is a limited liability company that did business in the State of New York at all times relevant to this action, namely, maintaining a parking lot adjacent to Zaro and Anjost's principal business location for the use of Zaro and Anjost, as well as leasing parking spaces to unrelated commercial entities.

15.     Upon information and belief, Bruckner is an employer in an industry affecting commerce within the meaning of Sections 3(5), 3(11), 3(12), and 4(a)(1) of ERISA, 29 U.S.C. §§ 1002(5), (11), (12), and 1003(a)(1).

16.     Bruckner's principal business location is 138 Bruckner Boulevard, Bronx, New York 10454.

17.     Bruckner's contact person for service of process through the New York Department of State is Stuart D. Zaro.

18.     Zaro and Anjost were trades or businesses under common control with each other as of November 25, 2017, within the meaning of Section 4001(b) of ERISA, 29 U.S.C. § 1301(b)(1), and, as such, Zaro and Anjost constitute a single employer for purposes of the obligation to pay withdrawal liability to the Pension Fund.

19.     Upon information and belief, Bruckner was a trade or business under common control with Zaro and/or Anjost as of November 25, 2017, within the meaning of Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), and, as such, Bruckner, Zaro, and Anjost constitute a single employer for purposes of the obligation to pay withdrawal liability to the Pension Fund.

Statement of Facts

20.     A collective bargaining agreement ("CBA") between Zaro and the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, Local 53 ("Local 53") has been in effect at all times relevant to this action.

21.     Zaro's CBA provides that "During the sixty (60) days preceding the expiration date, the Union and the Employer shall meet in order to commence negotiations for a succeeding contract. . . . If for any reason whatsoever, negotiations are continued beyond the

expiration date, then it is the understanding that this contract shall continue in full force and effect from day to day, until such time as a new contract shall have been agreed upon, or negotiations terminated by either party."

22.     Negotiations for a new contract between Zaro and Local 53 are ongoing and have not been terminated by either party.

23.      By Article XIV and Schedule A of its CBA, Zaro "agree[d] to be bound as a party by all the terms and provisions of" the Trust Agreement and agreed to remit contributions to the Pension Fund for the purpose of providing pension benefits to all employees working in the bargaining unit that Local 53 represented.

24.     The CBA requires Zaro to make contributions to the Pension Fund for "for each day or portion thereof, which an employee works in" a job classification covered by the CBA "or receives pay in lieu of work (such as holiday, vacation, pro rata vacation, and severance pay)."  From December 1, 2012, through November 30, 2014, the CBA required Zaro to make contributions to the Pension Fund at the rate of $14.72 per day. On and after December 1, 2014, the contribution rate increased to $15.18 per day.

25.     Zaro's CBA expressly states: "Contributions shall be paid from the first day the employee begins working in a job classification covered by the Collective Bargaining Agreement between the Employer and the Union, and shall be paid on behalf of all employees in covered job classification[s] – there are no exceptions for employees who are not members of the Union, temporary, seasonal, or part-time employees, for leased employees or for any other type of employee."

26.     A CBA between Anjost and the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, Local 3 ("Local 3") has been in effect at all times relevant to this action.

27.     During the relevant period, Local 3 merged with Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, Local 50, to form Local 53. Local 53 is the legal successor to Local 3 for all relevant purposes.

28.     Anjost's CBA provides that "During the sixty (60) days preceding the expiration date, the Union and the Employer shall meet in order to commence negotiations for a succeeding contract. . . . If, for any reason whatsoever, negotiations are continued beyond the expiration date, then it is the full understanding that this contract shall continue in full force and effect from day to day until such time as a new contract shall have been agreed upon or negotiations terminated by either party."

29.     Negotiations for a new contract between Anjost and Local 53 are ongoing and have not been terminated by either party.

30.     By Article XIV, Section 2 of its CBA, Anjost "agree[d] to be bound as a party by all the terms and provisions of" the Trust Agreement and agreed to remit contributions to the Pension Fund for the purpose of providing pension benefits to all employees working in the bargaining unit that Local 3 represented.

31.     The CBA requires Anjost to make contributions to the Pension Fund at the rate of $1.76 per day, "for each day or portion thereof, which an employee works in" a job classification covered by the collective bargaining agreement "or receives pay in lieu of work (such as holiday, vacation, pro rata vacation, and severance pay)."

32.     Anjost's CBA expressly states: "Contribution[s] shall be paid from the first day the employee begins working in a job classification covered by the Collective Bargaining Agreement between the Employer and the Union, and shall be paid on behalf of all employees in covered job classifications – there are no exceptions for employees who are not members of the Union, temporary, seasonal, or part-time employees, for leased employees or for any other type of employee."

*Rehabilitation Plan*

33.     Since March 2012, the Pension Fund has been in "critical status," as defined by Section 305(b)(2) of ERISA, 29 U.S.C. § 1085(b)(2). The Pension Fund's actuaries certified that it was in "critical status" for the plan year 2012, as required by ERISA § 305(b)(3), as inserted by § 202 of the Pension Protection Act of 2006 ("PPA") and further amended, 29 U.S.C. § 1085(b)(3). As a result of that certification, all contributing employers were required by Section 305(e)(7) of ERISA, 29 U.S.C. § 1085(e)(7) to pay a statutory surcharge equal to 5% of their contractual contribution rates, effective on or about June 1, 2012.

34.     In November 2012, the Plaintiff Trustees adopted a "Rehabilitation Plan" in compliance with Section 305(e)(3) of ERISA, 29 U.S.C. § 1085(e)(3).  The Rehabilitation Plan included two schedules of contribution increases and benefit reductions, known respectively as the "Preferred Schedule" and the "Default Schedule."  The Preferred Schedule required 5% annual contribution rate increases in addition to the statutory surcharge.  The Default Schedule required 10% annual contribution rate increases in addition to the statutory surcharge.

35.     Section VI.E of the Rehabilitation Plan, adopted in 2012 and still in effect, provides that if an employer elects the Preferred Schedule but subsequently has its participation in the Pension Fund "terminated for delinquency pursuant to the Fund's delinquency

procedure," the employer "will become retroactively subject to the Default Schedule of contributions for the affected Account as of the date that the Preferred Schedule election took effect."

36.     After the Trustees adopted the Rehabilitation Plan, the Pension Fund circulated a notice to contributing employers, including Zaro and Anjost. This notice described the contribution schedules and other rules of the rehabilitation plan, including the provision of Section VI.E applying to an employer that has its participation in Fund terminated for delinquency.  The notice was accompanied by an Election Form for Employers and Locals to sign if they agreed to the Preferred Schedule through collective bargaining. The Election Form explicitly incorporates "all Fund rules governing contributions to the Fund set forth in the Fund's PPA Schedules."

37.     In an agreement dated December 20, 2012, Zaro and Local 53 adopted the Preferred Schedule under the Rehabilitation Plan effective December 31, 2012, using the standard Election Form.

38.     In an agreement dated December 20, 2012, Anjost and Local 53 adopted the Preferred Schedule under the Rehabilitation Plan effective December 31, 2012, using the standard Election Form.

### *Delinquent Contributions – 2015 Audit*

39.     On August 27, 2015, an independent certified public accountant ("the auditor") performed a routine audit of Anjost's records for the calendar years 2013 and 2014, for the purpose of determining whether Anjost had paid the Pension Fund all of the contributions that its collective bargaining agreement required.

40.     The auditor determined that Anjost had failed to report to the Pension Fund, and had failed to remit contributions for, a number of days paid to employees working in job classifications covered by the CBA. All of the unreported days are expressly covered by Anjost's contribution obligation, as defined in the CBA provisions quoted in paragraphs 31 and 32.

41.     On September 24, 2015, the auditor reported these delinquencies to the Pension Fund. That was the first notice that the Pension Fund had of Anjost's failure to report and remit contributions for all employees and days of work covered by its contribution obligations.

42.     The September 24, 2015 audit report was provided to Anjost, and Anjost was given an opportunity to submit any documentation that might support a challenge to the accuracy of the auditor's findings.

43.     On or about June 24, 2016, Anjost informed the Pension Fund that five employees who were listed on the Zaro audit should have been listed on the Anjost audit.

44.     As a result, the audit report was revised on October 18, 2016.  The deficiency in Anjost's contributions reported by the auditor in the revised audit report was $32,230.09 for the years 2013 and 2014 (at Preferred Schedule contribution rates).

45.     On October 24, 2016, the revised audit report was provided to Anjost, and the Pension Fund demanded payment of the deficiency identified in the revised audit report. The Pension Fund again demanded payment of the deficiency in letters sent on November 21, 2016; December 19, 2016; and August 23, 2017. Anjost has not paid any of the deficiency that it owes for the years 2013 and 2014.

46.     After Anjost's termination from the Pension Fund due to its persistent delinquency in paying contributions, as further described in paragraphs 48-51 and 54-55 below,

the revised audit report was further revised to reflect the retroactively applicable Default Schedule contribution rates.  The deficiency in contributions reported by the auditor for the years 2013 and 2014, at Default Schedule rates, is $34,517.50.

47.     At all relevant times, Article V, Section 4 of the Trust Agreement has required payment of interest by an employer that is in default in the payment of contributions for a period of more than ten (10) days, as well as attorney's fees and costs incurred in enforcing the employer's obligations. At the rates of interest specified in the Pension Fund's policy on delinquent contributions, interest on the delinquency described in the revised audit report is due in the total amount of $13,652.89 through August 31, 2020, and interest continues to accrue.

### *Delinquent Contributions—June through November 2017*

48.     Zaro and Anjost failed to make any contributions to the Pension Fund for days worked (or paid in lieu of work) by bargaining unit employees between June 1, 2017, and November 25, 2017, (the effective date of Zaro and Anjost's withdrawal from the Pension Fund).  Furthermore, Zaro and Anjost failed to remit payroll information to the Pension Fund evidencing the amount of contributions due to the plan for the period between June 1, 2017, and November 25, 2017, despite being obligated by Article V, Section 5 of the Trust Agreement to "make all reports on contributions required by the Trustees."

49.     On October 5, 2017, the Pension Fund made demands to Zaro and Anjost for all contributions due and owing to the Pension Fund for the months of June through August 2017. In the same letters, the Pension Fund notified Zaro and Anjost that once an employer's contributions become delinquent for 120 days or more, it is the policy of the Pension Fund to terminate the employer's participation, which could result in withdrawal liability to the Pension Fund.

50.    On November 3, 2017, the Pension Fund again contacted Zaro and Anjost regarding their delinquencies and possible termination.

51.    Neither Zaro nor Anjost has remitted any contributions for the period June 1, 2017, through November 25, 2017.

52.    In order to determine the amount of Zaro and Anjost's delinquent contributions for this period, the Pension Fund's auditor needs to conduct an audit of Zaro and Anjost's payroll records to determine the number of days worked (or paid in lieu of work) by bargaining unit employees between June 1, 2017, through November 25, 2017.

53.    Under the Pension Fund's policy on delinquent contributions, Zaro and Anjost also owe interest on their delinquent contributions for the period June 1, 2017, through November 25, 2017.

*Withdrawal Liability*

54.    The Trust Agreement contained a provision at all times relevant to this matter that provides that "[a]n Employer shall cease to be an Employer within the meaning of this Agreement and Declaration of Trust . . . as determined by the Trustees, when he is delinquent in his contributions or reports to the Pension Fund." Trust Agreement, Article XII, § 1.

55.    Due to Zaro and Anjost's persistent delinquency in paying the contributions owed to the Fund under their collective bargaining agreements, the Plaintiff Trustees terminated Zaro and Anjost's participation in the Fund effective November 25, 2017, pursuant to the Trustees' authority under Article XII, Section 1 of the Trust Agreement. As a result of this termination, Zaro and Anjost completely withdrew from participation in the Pension Fund within the meaning of Section 4203 of ERISA, 29 U.S.C. § 1383.

56.     As a result of Zaro and Anjost's termination from participation in the Pension Fund due to their persistent delinquencies in paying contributions, both Zaro and Anjost incurred a "complete withdrawal" from the Pension Fund within the meaning of Section 4203(a)(1) of ERISA, 29 U.S.C. § 1383(a)(1), effective November 25, 2017.

57.     As a consequence of that complete withdrawal, Article V, Section 6 of the Trust Agreement and Section 4201(a) of ERISA, 29 U.S.C. § 1381(a), require Zaro and Anjost to pay withdrawal liability to the Pension Fund.

58.     Zaro, Anjost, and all trades or businesses under common control with Zaro and/or Anjost as of November 25, 2017, are jointly and severally liable for that withdrawal liability pursuant to Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1).

59.     The Trust Agreement grants the Trustees "full authority to adopt rules and regulations setting forth procedures for the determination and collection of withdrawal liability." Trust Agreement, Article V, § 6.  According to those procedures, Plaintiffs made a determination of the amount of Zaro and Anjost's withdrawal liability in compliance with all applicable statutory requirements and the rules of the Pension Fund.

60.     Plaintiffs notified Zaro and Anjost of the determination and made a demand to Zaro and Anjost for payment by letter dated April 5, 2018.  That letter set forth the schedule of monthly payments of $26,283 for 51 months, with a final payment of $11,621.

61.     This notice to Zaro and Anjost of the withdrawal liability determination constituted notice to all trades or businesses under common control with Zaro and/or Anjost.

62.     Pursuant to the schedule of payments in the April 5, 2018, letter, Zaro and Anjost's first withdrawal liability payment, in the amount of $26,283, was due on June 1, 2018. Zaro and Anjost failed to make that payment when due.

63.     By letter dated August 10, 2018, the Pension Fund informed Zaro and Anjost that Zaro and Anjost had failed to remit their required withdrawal liability payments. The Pension Fund also informed Zaro and Anjost that if they failed to cure the delinquency within 60 days, they would be in default in payment of their withdrawal liability obligation and would owe the entire amount of the withdrawal liability, plus interest from June 1, 2018.

64.     Zaro and Anjost failed to pay the overdue installments and therefore are in default in payment of their withdrawal liability, as defined in Section 4219(c)(5) of ERISA, 29 U.S.C. § 1399(c)(5).

65.     On or about September 20, 2018, Zaro and Anjost transmitted a Demand for Arbitration to the American Arbitration Association ("AAA"), pursuant to Section 4221(a) of ERISA, 29 U.S.C. § 1401(a).

66.     An employee of the AAA contacted the attorney for Zaro and Anjost to inquire as to the status of the arbitration on the following dates: October 28, 2019; November 26, 2019; December 23, 2019; January 21, 2020; and January 29, 2020.  In the latter two communications, the AAA notified Zaro and Anjost that the AAA's file would be closed if the AAA did not receive a response within seven days.

67.     Neither Zaro and Anjost nor their counsel notified the AAA that Zaro and Anjost wished to pursue the arbitration further.

68.     On February 10, 2020, the AAA notified the parties that the AAA was closing its file.

69.     Between December 2018 and February 2020, Zaro and Anjost made seven partial payments toward their withdrawal liability totaling $260,000.

70.     Despite these partial payments, Zaro and Anjost never came current on their withdrawal liability obligations at any point between June 1, 2018, and the present.

71.     Because of Zaro and Anjost's default, the full amount of their withdrawal liability (minus the $260,000 they have already paid) is due and owing to the Pension Fund.

72.     Under Section 4219(c)(5) and (6) of ERISA, 29 U.S.C. § 1399(c)(5) and (6), the Pension Fund is also entitled to interest on the full amount of Zaro and Anjost's withdrawal liability at rates prescribed by the Pension Benefit Guaranty Corporation, beginning on June 1, 2018, the date of the first unpaid installment.

73.     Pursuant to Article V, Section 4 of the Trust Agreement and Section 502(g)(2)(C) of ERISA, 29 U.S.C. § 1132(g)(2)(C), the Pension Fund adopted a resolution on June 23, 2017 (the "Resolution"), providing that the "amount of liquidated damages to be awarded in judgments pursuant to Section 502(g)(2)(C) of ERISA shall be equal to the greater of (a) the interest awarded pursuant to Section 502(g)(2)(B) of ERISA, or (b) 20 percent of the unpaid contributions or withdrawal liability awarded in the judgment."

*Default Schedule Contribution Rate Deficiency*

74.     As a result of Zaro and Anjost's withdrawal from the Fund and the provision of the Rehabilitation Plan quoted in paragraph 35, Zaro and Anjost were each retroactively subject to the Default Schedule of contributions as of December 31, 2012, when each employer's Preferred Schedule had taken effect.

75.     After applying the 5% statutory surcharge that was effective June 1, 2012, and the Default Schedule's 10% annual contribution rate increases to the contribution rates stated in Zaro's collective bargaining agreement, the contribution rates required of Zaro beginning January 1, 2013, were:

| Period | Rate |
|---|---|
| Jan. 1-Dec. 31, 2013 | $17.0016 |
| Jan. 1-Nov. 30, 2014 | $18.7018 |
| Dec. 1-31, 2014 | $19.2078 |
| Jan. 1-Dec. 31, 2015 | $21.1285 |
| Jan. 1-Dec. 31, 2016 | $23.2414 |
| Jan. 1-Dec. 31, 2017 | $25.5655 |

76.     After applying the 5% statutory surcharge that was effective June 1, 2012, and the

Default Schedule's 10% annual contribution rate increases to the contribution rate stated in

Anjost's collective bargaining agreement, the contribution rates required of Anjost beginning

January 1, 2013, were:

| Year | Rate |
|---|---|
| 2013 | $2.0328 |
| 2014 | $2.2361 |
| 2015 | $2.4597 |
| 2016 | $2.7057 |
| 2017 | $2.9762 |

77.     The Pension Fund has calculated the difference between the contributions that

Zaro remitted from January 1, 2013, to May 31, 2017, at the Preferred Schedule rates and the

contributions that are retroactively owed at the Default Schedule rates.  The principal amount

of that difference is $4,429.33 (not including the audit deficiencies described in paragraphs 39 to 47).

78.     Under the Pension Fund's policy on delinquent contributions, interest on the principal amount of $4,429.33 was $701.63 as of August 31, 2020, and interest continues to accrue.

79.     The Pension Fund has also calculated the difference between the contributions that Anjost remitted from January 1, 2013, to May 31, 2017, at the Preferred Schedule rates and the contributions that are retroactively owed at the Default Schedule rates.  The principal amount of that difference is $6,541.11 (not including the audit deficiencies described in paragraphs 39-47).

80.     Under the Pension Fund's policy on delinquent contributions, interest on the principal amount of $6,541.11 was $1,028.67 as of August 31, 2020, and interest continues to accrue.

*Audit Request*

81.      Under Article V, Section 5 of the Trust Agreement, the "Trustees may at any time have an audit made by independent certified public accountant of the payroll and wage records of any Employer" in connection with that employer's contributions or reports to the Trustees.

82.     On March 22, 2018, the Pension Fund informed both Zaro and Anjost that its auditors would be contacting them to schedule a time to perform an audit for the period of January 2015 through December 2017.

83.     On July 12, 2018, the Pension Fund's auditors emailed Zaro and Anjost to attempt to schedule an audit for August 21-23, 2018.  Zaro and Anjost did not respond.

84.     On July 23, 2018, the Pension Fund's auditors attempted to contact Zaro and Anjost by telephone and by email regarding scheduling.  Zaro and Anjost did not respond.

85.     On August 7, 2018, the Pension Fund's auditors again emailed Zaro and Anjost regarding scheduling.  Zaro and Anjost's legal counsel responded that the Pension Fund's auditors should direct all further communications to counsel.

86.     On September 4, 2020, counsel for the Pension Fund contacted counsel for Zaro and Anjost and requested that Zaro and Anjost provide dates within the next month for the requested payroll audit. Zaro and Anjost did not provide any dates.

87.     No audit has yet been performed, for either Zaro or Anjost, for the period of January 2015 through December 2017.

Statement of Claim

**COUNT I**
**Pursuant to Section 515 of ERISA**
**(Against Anjost)**

88.     Plaintiffs reassert all of the facts alleged in paragraphs 1 through 87.

89.     Anjost is delinquent in its obligations to the Pension Fund in the principal amount of $34,517.50, by virtue of its failure to pay all contributions required by the collective bargaining agreement for employees working in the bargaining unit or paid in lieu of work, as found by the auditor for years 2013 and 2014.

90.     Anjost's failure to make its required contributions is a violation of Section 515 of ERISA, 29 U.S.C. § 1145.

91.     Under Sections 515 and 502(g)(2) of ERISA, 29 U.S.C. §§ 1145 and 1132(g)(2), Anjost is obligated to Plaintiffs to pay the full amount of all delinquent contributions plus interest, liquidated damages, attorneys' fees, and costs of this action.

## COUNT II
### Pursuant to Section 515 of ERISA
### (Against Zaro and Anjost)

92.     Plaintiffs reassert all of the facts alleged in paragraphs 1 through 91.

93.     Zaro is delinquent in its obligations to the Pension Fund by virtue of its failure to pay the contributions required by the collective bargaining agreement for employees working in the bargaining unit or paid in lieu of work from June 1, 2017, through November 25, 2017.

94.     Anjost is delinquent in its obligations to the Pension Fund by virtue of its failure to pay the contributions required by the collective bargaining agreement for employees working in the bargaining unit or paid in lieu of work from June 1, 2017, through November 25, 2017.

95.     Both Zaro and Anjost's failures to make their required contributions are violations of Section 515 of ERISA, 29 U.S.C. § 1145.

96.     Under Sections 515 and 502(g)(2) of ERISA, 29 U.S.C. §§ 1145 and 1132(g)(2), Zaro and Anjost are obligated to Plaintiffs to pay the full amount of all delinquent contributions plus interest, liquidated damages, attorneys' fees, and costs of this action.

## COUNT III
### Pursuant to Section 515 of ERISA
### (Against All Defendants)

97.     Plaintiffs reassert all of the facts alleged in Paragraphs 1 through 96.

98.     Section 4301 of ERISA, 29 U.S.C. § 1451 provides that any failure of an employer to make a withdrawal liability payment when due shall be treated as a delinquent contribution within the meaning of Section 515 of ERISA, 29 U.S.C. § 1145.

99.     Section 515 of ERISA, 29 U.S.C. § 1145 requires the court, upon entering judgment in favor of a plan in such an action, to award not only the unpaid withdrawal liability, but also interest, liquidated damages, attorneys' fees, and costs of the action.  That interest, in

cases where an employer defaults on its obligation to pay withdrawal liability, is calculated on the full amount of the outstanding withdrawal liability from the due date of the first installment payment that was not timely made. ERISA § 4219(c)(5), 29 U.S.C. § 1399(c)(5). In this case, that date was June 1, 2018.

100.    Under Section 4301(b) of ERISA, 29 U.S.C. § 1451(b), Zaro, Anjost, and all trades or business under common control with Zaro and/or Anjost as of November 25, 2017, including, upon information and belief, Bruckner, are jointly and severally liable for the withdrawal liability, interest, liquidated damages, attorneys' fees, and costs of the action that Zaro and Anjost owe to Plaintiffs.

101.    Plaintiffs are therefore entitled to judgment in the full amount of all unpaid withdrawal liability, plus interest, liquidated damages, attorneys' fees, and costs of this action.

**COUNT IV**
**Pursuant to Section 515 of ERISA**
**(Against Zaro and Anjost)**

102.    Plaintiffs reassert all of the facts alleged in paragraphs 1 through 101.

103.    Pursuant to the Pension Fund's Rehabilitation Plan, Zaro is obligated to pay the difference between the contributions it remitted to the Pension Fund at the Preferred Schedule rates and the amount that was due retroactively at Default Schedule rates for the period from January 1, 2013, through May 31, 2017.

104.    Pursuant to the Pension Fund's Rehabilitation Plan, Anjost is obligated to pay the difference between the contributions it remitted to the Pension Fund at the Preferred Schedule rates and the amount that was due retroactively at Default Schedule rates for the period from January 1, 2013, through May 31, 2017.

105.    Both Zaro and Anjost's failures to pay these retroactive contributions are violations of 29 U.S.C. § 1145.

106.    Under Sections 515 and 502(g)(2) of ERISA, 29 U.S.C. §§ 1145 and 1132(g)(2), Zaro and Anjost are obligated to the Plaintiffs to pay the full amount of all delinquent contributions, plus interest, liquidated damages, attorneys' fees, and costs of this action.

**COUNT V**
**Request for an Audit**
**(Against Zaro and Anjost)**

107.    Plaintiffs reassert all of the facts alleged in paragraphs 1 through 106.

108.    Both Zaro and Anjost are obligated by the plan's Trust Agreement to "make all reports on contributions required by the Trustees."

109.    Zaro and Anjost have failed to provide the remittance reports required by the plan's Trust Agreement and Trustees in order to determine the amounts owed to the Pension Fund for June 1, 2017, through November 25, 2017.

110.    Article V, Section 5 of the plan's Trust Agreement further provides that the "Trustees may at any time have an audit made by independent certified public accountants of the payroll and wage records of any employer in connection with the said contributions and/or reports."

111.    The Trustees requested an audit of Zaro's and Anjost's contributions for the period of 2015 through 2017, for the purpose of verifying whether both Zaro and Anjost had paid all required contributions from January 1, 2015, through May 30, 2017, and for the purpose of ascertaining the amount of delinquent contributions owed by Zaro and Anjost for the period June 1, 2017, through November 25, 2017.  To date, Zaro and Anjost have not cooperated with that request.

112.     Accordingly, Plaintiffs are entitled to appropriate equitable relief under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), to enforce Zaro's and Anjost's obligations to provide remittance reports and comply with the requested audit under the terms of the plan.

<u>Prayer for Relief</u>

WHEREFORE, Plaintiffs ask the Court to award them relief as follows:

A.     An injunction, preliminary or permanent, as necessary to require Zaro and Anjost promptly to schedule an audit by certified public accountants of their payroll and wage records for the period January 1, 2015, through November 25, 2017, in order to ascertain whether Zaro and Anjost remitted all contributions that were due for the period January 1, 2015, through May 30, 2017, and to ascertain the amount of contributions due for the period June 1, 2017, through November 25, 2017.

B.     A judgment ordering Zaro, its officers, agents, successors, and assigns:

1. To pay to the Pension Fund all delinquent contributions it owes to the Pension Fund;

2. To pay to the Pension Fund all withdrawal liability owed by Zaro and Anjost;

3. To pay to the Pension Fund interest that has accrued on all delinquent contributions and withdrawal liability;

4. To pay to the Pension Fund an additional amount equal to the greater of the accrued interest or liquidated damages in the amount of twenty percent (20%); and

5. To pay to the Plaintiffs their reasonable attorneys' fees, accountant fees, and costs of this action.

C.     A judgment ordering Anjost, its officers, agents, successors, and assigns:

1. To pay to the Pension Fund all delinquent contributions it owes to the Pension Fund;

2. To pay to the Pension Fund all withdrawal liability owed by Zaro and Anjost;

3. To pay to the Pension Fund interest that has accrued on all delinquent contributions and withdrawal liability;

4. To pay to the Pension Fund an additional amount equal to the greater of the accrued interest or liquidated damages in the amount of twenty percent (20%); and

5. To pay to the Plaintiffs their reasonable attorneys' fees, accountant fees, and costs of this action.

D.      A judgment ordering Bruckner, its officers, agents, successors, and assigns:

1. To pay to the Pension Fund all withdrawal liability owed by Zaro and Anjost;

2. To pay to the Pension Fund interest that has accrued on all withdrawal liability;

3. To pay to the Pension Fund an additional amount equal to the greater of the accrued interest or liquidated damages in the amount of twenty percent (20%); and

4. To pay to the Plaintiffs their reasonable attorneys' fees, accountant fees, and costs of this action; and

E.      Such other legal or equitable relief as the interests of justice may require.


Dated: November 24, 2020                    */s/ Caitlin Kekacs*
                                            Caitlin Kekacs
                                            BREDHOFF & KAISER, PLLC
                                            805 15th Street, NW, Suite 1000
                                            Washington, DC 20005
                                            Tel: (202) 842-2600
                                            Fax: (202) 842-1888
                                            ckekacs@bredhoff.com

                                            *Attorney for Plaintiffs*

## <u>SERVICE UPON SECRETARY OF LABOR, SECRETARY OF THE TREASURY, AND PENSION BENEFIT GUARANTY CORPORATION</u>

A copy of this Complaint will be served upon the Secretary of Labor, the Secretary of the Treasury, and the Pension Benefit Guaranty Corporation by certified mail, as required by Sections 502(h) and 4301 of ERISA, 29 U.S.C. §§ 1132(h), 1451(g).

Dated: November 24, 2020                    */s/ Caitlin Kekacs*
                                            Caitlin Kekacs