UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                         :

BAKERY AND CONFECTIONERY UNION AND     :
INDUSTRY INTERNATIONAL PENSION FUND and  :
TRUSTEES OF THE BAKERY AND                :
CONFECTIONERY UNION AND INDUSTRY       :            20-cv-9894 (LJL)
INTERNATIONAL PENSION FUND,           :
                                                           :        OPINION AND ORDER
                          Plaintiffs,       :
                                                             :
                  -v-                  :
                                                             :

ZARO BAKE SHOP, INC., ANJOST CORP., and 138  :
BRUCKNER BLVD. ASSOCIATES, LLC,        :
                                                           :
                        Defendants.     :
                                                           :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendants Zaro Bake Shop, Inc. ("Zaro"), Anjost Corp. ("Anjost"), and 138 Bruckner

Blvd. Associates, LLC ("Bruckner," and collectively, "Defendants") move to compel arbitration

of this action brought by Plaintiffs Bakery and Confectionery Union and Industry International

Pension Fund ("Fund") and Trustees of the Bakery and Confectionery Union and Industry

International Pension Fund ("Trustees," and together, with the "Fund," "Plaintiffs").

      For the following reasons, the motion to compel arbitration is denied.

BACKGROUND

## I.    The Parties

      The Fund is a pension fund established and maintained pursuant to Section 302(c)(5) of

the Labor Management Relations Act of 1947 ("LMRA"), as amended, 29 U.S.C. § 186(c)(5).

Dkt. No. 1 ("Compl.") ¶ 4.  It is an employee benefit plan within the meaning of Sections 3(2)

and 3(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§§ 1002(2)-(3), and it "is maintained for the purpose of providing retirement and related benefits to eligible employees of participating employers." *Id.* The Fund is also a multiemployer pension plan within the meaning of Sections 3(37)(A) and 4001(a)(3) of ERISA, 29 U.S.C. §§ 1002(37)(A) and 1301(a)(3). *Id.* It was established and is maintained pursuant to an Agreement and Declaration of Trust, most recently amended through June 30, 2009 ("Trust Agreement"). *Id.*

The Trustees are fiduciaries within the meaning of Section 3(21)(a) of ERISA, 29 U.S.C. § 1002(21)(A), and are the plan sponsors of the Fund within the meaning of Section 3(16)(B) of ERISA, 29 U.S.C. § 1002(16)(B). *Id.* ¶ 5.

Defendants Zaro and Anjost are businesses engaged in the production of baked goods. *Id.* ¶¶ 8, 11. Both are employers in an industry affecting commerce within the meaning of Sections 3(5), 3(11), 3(12), and 4(a)(1) of ERISA, 29 U.S.C. §§ 1002(5), (11), (12), and 1003(a)(1). *Id.* Defendant Bruckner is a limited liability company that maintains a parking lot adjacent to Zaro and Anjost's principal business location for the use of Zaro and Anjost; it also leases parking spaces to unrelated commercial entities. *Id.* ¶ 14. Plaintiffs allege that Zaro, Anjost, and Bruckner were trades or businesses under common control with each other as of November 25, 2017 within the meaning of Section 4001(b) of ERISA, 29 U.S.C. § 1301(b)(1), and therefore constitute a single employer for purposes of the obligation to pay withdrawal liability to the Fund. *Id.* ¶¶ 18-19.

Zaro and the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, Local 53 ("Local 53") are parties to a collective bargaining agreement (the "Zaro CBA"). *Id.* ¶ 20. Anjost is also party to a collective bargaining agreement with Local 53 (the "Anjost

CBA," and with the Zaro CBA, the "CBAs").[1]  *Id.* ¶¶ 20, 26.  Pursuant to the CBAs, Zaro and Anjost are bound by the Trust Agreement.  *Id.* ¶¶ 23, 30.  The CBAs require Zaro and Anjost to make contributions to the Fund for the purpose of providing pension benefits to all employees working in the bargaining unit that Local 53 represented.  *Id.*

## II.    The Multiemployer Pension Plan Amendments Act

### A.    Enactment

ERISA was enacted in 1974 in an effort "to ensure that employees and their beneficiaries would not be deprived of anticipated benefits from their private retirement pension plans." *T.I.M.E.-DC, Inc. v. Mgmt.-Lab. Welfare & Pension Funds, of Loc. 1730 Int'l Longshoremen's Ass'n*, 756 F.2d 939, 943 (2d Cir. 1985).  ERISA created an agency, the Pension Benefit Guaranty Corporation ("PBGC"), to collect premiums from covered pension plans and to pay out accrued benefits to employees in the event a pension plan had insufficient funds.  *Trs. of Loc. 138 Pension Tr. Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 129 (2d Cir. 2012); *see also Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984) (describing the PBGC as "collect[ing] insurance premiums from covered pension plans and provid[ing] benefits to participants in those plans if their plan terminates with insufficient assets to support its guaranteed benefits").

One type of covered pension plan was the multiemployer pension plan "in which multiple employers pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers."  *F.W. Honerkamp*, 692 F.3d at 129.  But multiemployer plans presented a problem of employer

---

[1] Anjost originally entered into a CBA with Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, Local 3 ("Local 3"), but Local 3 has since merged with Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, Local 50, to form Local 53.  Compl. ¶ 27.  Local 53 is the legal successor to Local 3 for all relevant purposes.  *Id.*

withdrawal.  Specifically, under ERISA, "an employer that had paid all required contributions to a multiemployer plan could withdraw from the plan, and if the plan did not terminate within five years after withdrawal, the employer had no further responsibility for the plan's unfunded liabilities."  *Id.*  The result was that a plan could be left with sizeable unfunded vested liabilities, which created an "undesirable incentive for employers to withdraw from plans and an unfair burden on the employers who continue[d] to maintain the plans."  *Id.* (quoting H.R. Rep. No. 96-869, Part II, 96th Cong., 2d Sess. 10, *reprinted in* 1980 U.S. Code Cong. & Ad. News 2918, 2993, 3001); *see also F.W. Honerkamp*, 692 F.3d at 129 (employer withdrawals "push[] the contribution rates for remaining employers to higher and higher levels in order to fund past service liabilities. . . . The rising costs may encourage—or force—further withdrawal, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base") (quoting *R.A. Gray & Co.*, 467 U.S. at 722 n.2).  The "potential of widespread termination of pension plans caused by cascading withdrawals" also threatened to impose a heavy burden on the PBGC, which acted as the insurer of protected pension funds and which would be forced to assume obligations in excess of its capacity.  *See F.W. Honerkamp*, F.3d at 130; *see also R.A. Gray & Co.*, 467 U.S. at 717.

To address this issue, Congress adopted the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA").  *See T.I.M.E.-DC*, 756 F.2d at 944.  The MPPAA requires an employer that withdraws from a plan to pay its share of the benefits that have accrued to plan participants and for which the plan continues to be liable.  *See id.*; *see also* 29 U.S.C. § 1391(a) ("[A]n employer [that] withdraws from a multiemployer plan . . . is liable to the plan in the amount determined . . . to be the withdrawal liability.").[2]  This "withdrawal liability" was intended to

---

[2] ERISA defines the term "employer" broadly to include related entities.  *See* 29 U.S.C.

4

protect the interests of participants and beneficiaries in financially-distressed multiemployer plans and to encourage the growth and maintenance of multiemployer plans. *See, e.g.*, *T.I.M.E.-DC*, 756 F.2d at 944 ("The objective of [withdrawal liability] is to discourage withdrawals and to provide a financial cushion for the plan.") (quoting *Multiemployer Pension Plan Amendments Act of 1980: Hearings on H.R. 3904 Before Subcomm. On Labor-Management Relations of the House Comm. on Education and Labor*, 96th Cong., 1st Sess. 362 (1979)).

Withdrawal liability is the withdrawing employer's proportionate share of the plan's unfunded vested benefits. *See F.W. Honerkamp*, 692 F.3d at 130. A plan's unfunded vested benefits are calculated by finding "the difference between the present value of the pension fund's assets and the present value of its future obligations to employees covered by the pension plan." *Chi. Truck Drivers, Helpers and Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 347 (7th Cir. 2012) (citing 29 U.S.C. §§ 1381, 1391; *see also* 29 U.S.C. § 1393(c). Estimation of this value depends critically on estimating the interest rate at which the pension fund's assets are likely to grow—"[t]he higher the estimated rate of growth, the less the employers must put into the fund today to cover the future entitlements of the plan's participants and beneficiaries." *CPC Logistics*, 698 F.3d at 348.

Under the MPPAA, the plan sponsor's calculation of the liability and schedule for liability payments are considered to be presumptively correct, subject to a limited right of the employer to request review and, if a dispute arises, to demand arbitration. Specifically, the

§ 1301(b)(1) ("[A]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer."). Each member of a controlled group is "jointly and severally liable for payment of . . . contributions [under the plan]." 29 U.S.C. § 1082(b)(2).

statute provides: "As soon as practicable after an employer's . . . withdrawal," the plan sponsor must notify the employer of the amount of its liability and the schedule of liability payments. 29 U.S.C. § 1399(b)(1). No later than 90 days after such notice, the employer "may ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments." *Id.* § 1399(2)(A). After "a reasonable review of any matters raised," the plan sponsor must notify the employer of the plan sponsor's decision, its basis, and any change in the employer's liability. *Id.* § 1399(2)(B).

### B.    Mandatory Arbitration of Withdrawal Liability

The MPPAA provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections [governing withdrawal liability] shall be resolved through arbitration." *Id.* § 1401(a)(1). Congress intended the arbitration provision to promote "judicial economy and judicial restraint." *Mason and Dixon Tank Lines, Inc. v. Cent. States, Se. and Sw. Areas Pension Fund*, 852 F.2d 156, 164 (6th Cir. 1988) (quoting *Flying Tiger Line v. Teamsters Pension Tr. Fund*, 830 F.2d 1241, 1248 (3d Cir. 1987)). "The arbitrator's decision may dispose of the dispute, pare down the issues for judicial determination, or simply provide a factual record for effective resolution of the issues." *Id.*

Under the arbitration provision, either party may unilaterally initiate arbitration "within a 60-day period after the earlier of (A) the date of notification to the employer [of the outcome of the review], or (B) 120 days after the date of the employer's request [for review]." 29 U.S.C. §1401(a)(1). Alternatively, "parties may jointly initiate arbitration within the 180-day period after the date of the plan sponsor's demand under section 1399(b)(1) of this title." *Id.*

Under the MPPAA's "pay now, dispute later" scheme, the employer must pay the withdrawal liability in accordance with the schedule set forth by the plan sponsor, beginning no later than 60 days after the date of demand, notwithstanding any requests for review or appeal of

the plan's determinations. *See id.* § 1399(c)(2). "[D]uring the pendency of any arbitration proceedings, payments must still be made in accordance with the sponsor's determination, with any subsequent adjustments to occur after the arbitrator's final decision." *ILGWU Nat. Ret. Fund v. Levy Brothers Frocks*, 846 F.2d 879, 881-82 (2d Cir. 1988) (citing 29 U.S.C. § 1401(d)). If the employer fails to make its scheduled payments, the plan sponsor must notify the employer of the delinquency, and the employer is afforded 60 days from its receipt of the notification to cure the deficiency. *See, e.g.*, *Trs. of Leather Goods, Handbags, & Novelty Workers' Union Loc. 1 Joint Ret. Fund v. Cent. Fur Storage Co.*, 2019 WL 3937132, at *5 (E.D.N.Y. Aug. 2, 2019). Failure to cure within this time frame constitutes default on the part of the employer, and the plan sponsor may require immediate payment of the outstanding amount of the withdrawal liability, plus accrued interest. 29 U.S.C. § 1399(c)(5). The "pay now, dispute later" is intended to address and "to alleviate the risk that during the course of arbitration, an employer will become insolvent, and the fund will not be able to collect in the event of a favorable award." *Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 726 F.3d 738, 741 (6th Cir. 2013).

The burden in the arbitration proceeding is on the employer. The "determination made by a plan sponsor . . . is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." 29 U.S.C. § 1401(a)(3)(A). The MPPAA further provides that "[a]ny arbitration proceedings under this section shall, to the extent consistent with this subchapter, be conducted in the same manner, subject to the same limitations, carried out with the same powers (including subpoena power), and enforced in United States courts as an arbitration proceeding carried out under title 9," i.e., the FAA. *Id.* § 1401(b)(3).

At the conclusion of "the arbitration proceedings in favor of one of the parties, any party thereto may bring an action, no later than 30 days after the issuance of an arbitrator's award, in an appropriate United States district court in accordance with section 1451 of this title to enforce, vacate, or modify the arbitrator's award." *Id.* § 1401(b)(2). The proceeding to enforce, vacate, or modify the arbitral award has "a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." *Id.* § 1401(c).

In the event that "no arbitration proceeding has been initiated pursuant to subsection (a), the amounts demanded by the plan sponsor . . . shall be due and owing on the schedule set forth by the plan sponsor." *Id.* § 1401(b)(1). If an employer fails to initiate arbitration within the statute's prescribed time period, it is "deemed to have defaulted and waived any challenge to the plan sponsor's determination." *United Here Workers Pension Fund v. Swan Finishing Co.*, 2006 WL 1341301, at *1 (S.D.N.Y. Feb. 10, 2006) (collecting cases). "The plan sponsor may [then] bring an action in a State or Federal court of competent jurisdiction for collection." 29 U.S.C. § 1401(b)(1).

### III. The Fund's Rehabilitation Plan

ERISA was amended in 2006 by the Pension Protection Act of 2006, Pub. L. No. 109-280, § 701(a)(2), 120 Stat. 780 (2006), which introduced "measures designed to protect and restore multiemployer pension plans in danger of being unable to meet their pension distribution obligations in the near future." *F.W. Honerkamp*, 692 F.3d at 130. The statute created two categories of such plans: "endangered" and "critical." *Id.* A plan is "endangered" if, inter alia, it is less than 80% funded; it is in "critical" status if, inter alia, it is less than 65% funded. *See* 29 U.S.C. § 1085(b). If a plan falls into critical status, the plan sponsor must notify the participating employers and unions, *see id.* § 1085(b)(3)(D), and each participating employer must contribute an additional surcharge of 5% to 10% of the contribution amount required under the applicable

CBA, *see id.* § 1085(e)(7). The plan sponsor must also adopt a rehabilitation plan that sets forth new schedules of reduced benefits and increased contributions from which participating employers and unions may choose when it is time to negotiate successor CBAs. *Id.* § 1085(e).

Since March 2012, the Fund has been in critical status, indicating that it has been and is seriously underfunded. Compl. ¶ 33. The Fund's actuaries certified that it was in "critical status." *Id.* As a result of that status, all contributing employers were required, pursuant to 29 U.S.C. § 1085(e)(7), to pay a statutory surcharge equal to 5% of their contractual contribution rates, effective on or about June 1, 2012. *Id.* In November 2012, the Trustees adopted a rehabilitation plan (the "Rehabilitation Plan"). *Id.* ¶ 34. The Rehabilitation Plan included two alternative schedules of contribution increases and benefit reductions: the "Preferred Schedule" required 5% annual contribution rate increases in addition to the statutory surcharge, and the "Default Schedule" required 10% annual contribution rate increases in addition to the statutory surcharge. *Id.*

Section VI.E of the Rehabilitation Plan provided that if an employer elects the Preferred Schedule but subsequently has its participation in the Fund "terminated for delinquency pursuant to the Fund's delinquency procedure," the employer "will become retroactively subject to the Default Schedule of contributions for the affected Account as of the date that the Preferred Schedule election took effect." *Id.* ¶ 35.

On December 20, 2012, Zaro, Anjost, and Local 53 each adopted the Preferred Schedule under the Rehabilitation Plan effective December 31, 2012, using an election form. *Id.* ¶¶ 37-38.

## IV.    Delinquent Contributions

### A.    Anjost's Deficiencies for 2013 and 2014

On August 27, 2015, an independent auditor performed a routine audit of Anjost's records for calendar years 2013 and 2014 in order to determine whether Anjost had paid the

Fund all contributions required by its CBA. *Id.* ¶ 39. The auditor concluded that Anjost had failed to report to the Fund, and had failed to remit contributions for a number of days paid to employees working in job classifications covered by the CBA. *Id.* ¶ 40.

On September 24, 2015, the auditor informed the Fund of Anjost's delinquencies. *Id.* ¶ 41. On October 24, 2016, the Fund provided Anjost the audit report, revised for certain inaccuracies, and demanded payment of $32,230.09. *Id.* ¶¶ 44-45. Plaintiffs assert that despite three additional demands for payment, Anjost has not paid any of the deficiencies for years 2013 and 2014 to date. *Id.* ¶ 45.

Following Anjost's termination from the Fund effective November 25, 2017, the auditor further revised Anjost's deficiency contribution to reflect the retroactively applicable Default Schedule contribution rates. *Id.* ¶¶ 46, 48, 55. Plaintiffs allege that Anjost now owes $34,517.50 in delinquent payments for years 2013 and 2014, as well as interest, attorneys' fees, and costs incurred in enforcing this obligation. *Id.* ¶¶ 46-47.

### B.     Anjost and Zaro's Deficiencies for 2017

On June 1, 2017, Zaro and Anjost stopped remitting contributions to the Fund. *Id.* ¶ 48. On October 5, 2017 and November 3, 2017, the Fund demanded from Zaro and Anjost all contributions due for months of June through August 2017. *Id.* ¶¶ 49-50. In the same letters, the Fund warned Zaro and Anjost that they could be terminated from the Fund if their contributions were delinquent for more than 120 days and that termination could result in withdrawal liability. *Id.* Plaintiffs allege that neither Zaro nor Anjost has remitted any contributions for the period between June 1, 2017 and November 25, 2017. *Id.* ¶ 51. Plaintiffs terminated Zaro and Anjost from the Fund effective November 25, 2017. *Id.* ¶¶ 48, 55.

## V.    Audit Requests by Plaintiffs

Plaintiffs allege that despite the Trustees' authority to "'at any time have an audit made by [an] independent certified public accountant of the payroll and wage records of any Employer' in connection with that employer's contributions or reports to the Trustees" under Article V, Section 5 of the Trust Agreement, *id.* ¶ 81, Zaro and Anjost have failed to comply with the Fund's requests for an audit, *see id.* ¶¶ 82-87.  Specifically, Plaintiffs assert that on March 22, 2018, the Fund notified Zaro and Anjost that the Fund's auditors would contact them to schedule an audit for the period of January 2015 through December 2017.  *Id.* ¶ 82.  Zaro and Anjost did not respond to any of the auditors' requests made on July 12, 2018, July 23, 2018, August 7, 2018, and September 4, 2020.  *Id.* ¶¶ 83-86.  No audit has yet been performed, for either Zaro or Anjost, for the period of January 2015 through December 2017.  *Id.* ¶ 87.

## VI.    Withdrawal Liability

### A.    Termination and Default Determinations

As a result of Zaro and Anjost's persistent failures to make contributions according to their respective CBAs, the Trustees terminated Zaro and Anjost's participation in the Fund, effective November 25, 2017, pursuant to the Trustees' authority under Article XII, Section 1 of the Trust Agreement.  *Id.* ¶¶ 54-55.  Consequently, Zaro and Anjost incurred a "complete withdrawal" from the Fund, 29 U.S.C. § 1381(a)(1), and owe the Fund a withdrawal liability, pursuant to Article V, Section 6 of the Trust Agreement and Section 4201(a) of ERISA, 29 U.S.C. § 1381(a).  *See* Compl. ¶¶ 56-57.

Pursuant to their authority under Article V, Section 6 of the Trust Agreement and under applicable statutory requirements and the rules of the Fund, the Trustees determined the amount of Zaro and Anjost's withdrawal liability.  *Id.* ¶ 59.  On April 5, 2018, Plaintiffs notified Zaro and Anjost of their termination determination and demanded monthly payments of $26,283 for

51 months, with an additional final payment of $11,621.  *Id.* ¶ 60; Dkt. No. 21 ("Kekacs Decl.")

¶ 6; *id.*, Ex. A.  Zaro and Anjost's first payment of $26,283 under the schedule was due on June

1, 2018.  Compl. ¶ 62.  Both Defendants failed to make the payment by the date.  *Id.*

On July 2, 2018, Zaro and Anjost sent the Fund a request for review of the withdrawal

liability (the "Request"), in which it disputed the Trustees' determination that they withdrew

from the Fund and in the alternative, disputed the amount of the assessed withdrawal liability.

Dkt. No. 13 ("Volpe Decl.")  ¶ 2.  On July 24, 2018, the Fund rejected the Request.  *Id.* ¶ 3.

On August 10, 2018, the Fund notified Zaro and Anjost that they had failed to make their

required withdrawal liability payments.  Compl. ¶ 63.  The letter also informed Zaro and Anjost

that if they did not cure their delinquency within 60 days, they would be in default and therefore

owe the entire amount of the withdrawal liability, plus interest from June 1, 2018.  *Id.*  Plaintiffs

allege that Zaro and Anjost failed to remit the overdue installments and thus are in default with

respect to payment of their withdrawal liability, within the meaning of Section 4219(c)(5) of

ERISA, 29 U.S.C. § 1399(c)(5).  *Id.* ¶ 64.

Defendants assert that as of January 30, 2020, Zaro, Anjost, and Plaintiffs "were

discussing a potential payment plan and resolution for [Zaro and Anjost's] withdrawal liability

debt."  Dkt. No. 23 ¶¶ 1-2.  On January 30, 2020, Defendants' counsel sent a check, payable to

the Fund, in the amount of $35,000 "in connection with the outstanding withdrawal liability

owed by the employer."  *Id.* ¶¶ 3-4; *see id.*, Ex. 1.  Defendants contend that the payment was

made "to show good faith while the parties continued to negotiate a potential payment plan and

resolution."  *Id.* ¶ 3.  Plaintiffs allege that while Zaro and Anjost made seven partial payments

totaling $260,000 toward their withdrawal liability between December 2018 and February 2020,

they never became current on their obligations and are currently behind on their withdrawal

liability payments in the amount of $607,339, plus interest.  Compl. ¶¶ 69-70; Kekacs Decl. ¶ 8.

### B.    Arbitration Proceeding

After the Fund notified Zaro and Anjost about their failure to make the required

withdrawal liability payments, but before Defendants sent the good faith check of $35,000 to

Plaintiffs, on September 20, 2018, Zaro and Anjost submitted a Notice of Intent to Arbitrate

("Notice of Intent") to the American Arbitration Association ("AAA") regarding the withdrawal

liability assessment, pursuant to 29 U.S.C. § 1401(a).  Compl. ¶ 65; Volpe Decl. ¶ 4; *id.*, Ex. 1.

The Notice of Intent stated that Zaro and Anjost "dispute[] that [they] ha[ve] withdrawn from the

Fund and, alternatively . . . that the amount of assessed withdrawal liability is correct."  Volpe

Decl., Ex. 1 at 1.  The Notice of Intent further asserted that "[t]he Fund has chosen to use the

'Segal Blend' for determining the discount rate in valuing the unfunded vested benefits . . .

without the necessary support" for using it.  *Id.*

On September 25, 2018, the AAA acknowledged the Notice of Intent and informed the

Fund that it had until October 3, 2018 to file an answer.  Volpe Decl. ¶ 5; *see id.*, Ex. 2.  The

parties agreed to extend the deadline for the Fund's response to October 17, 2018 on which date

the Fund submitted its answer to AAA.  Volpe Decl. ¶ 6; *id.*, Ex. 3.  In the answer, the Fund

stated that because "[t]he only matter that [Zaro and Anjost] asked the Pension Fund to review in

connection with its determination was 'the actuarial assumptions underlying the determination of

the amount of the Fund's unfunded vested benefits,'" the issue of whether Zaro and Anjost had

withdrawn from the Fund "has been waived."  Volpe Decl., Ex. 3 ¶ 1.  Further, the Fund stated

that "[t]he actuarial assumptions and methods that the Pension Fund's actuary uses in

determining the amount of unfunded vested benefits for purposes in the aggregate, represent the

actuary's best estimate of anticipated experience under the plan, as required by section 4213 of

ERISA" and that "[t]he use of the 'Segal Blend' is properly supported." *Id.* ¶ 2. The Fund also provided a list of proposed arbitrators. *Id.*

On October 18, 2018, the AAA-selected arbitrator signed a notice of appointment. Volpe Decl. ¶ 7; *id.*, Ex. 4. On November 20, 2018, the parties participated in a preliminary arbitration management conference before the arbitrator. Volpe Decl. ¶ 8; *id.*, Ex. 5. In the conference, it was established that "[t]he issue in this case relates to challenges to the actuary's best estimate used in determining the withdrawal liability," and the parties agreed on discovery deadlines. *Id.*

Thereafter, the parties agreed to stay the arbitration proceedings because of a then-anticipated decision in *New York Times Co. v. Newspaper and Mail Deliverers' Publishers' Pension Fund* pending in the Second Circuit. Volpe Decl. ¶ 9; *see N.Y. Times Co. v. Newspaper and Mail Deliverers' Publishers' Pension Fund*, Nos. 18-1140, 18-1480 (2d Cir.) ("*New York Times*"). The issue in *New York Times* was whether the "Segal Blend" discount rate assumption used by many multiemployer pension plans to calculate withdrawal liability was valid. Volpe Decl. ¶ 9. Because the Fund had used the "Segal Blend" method to calculate Zaro and Anjost's withdrawal liability, the parties agreed to await the Second Circuit's decision in *New York Times* and to stay the arbitration in the meantime. *Id.* On January 31, 2019, counsel for Zaro and Anjost notified the AAA that the parties had jointly consented to stay the arbitration, pending the Second Circuit's ruling in *New York Times. Id.* ¶ 10; *id.*, Ex. 6. On February 4, 2019, the AAA confirmed to the parties that the arbitrator had agreed to hold the matter in abeyance as a result of the parties' joint request to stay. Volpe Decl. ¶ 11; *id.*, Ex. 7.

On or about September 16, 2019, however, the parties in *New York Times* stipulated to withdraw the case with prejudice. Volpe Decl. ¶ 13; *New York Times*, No. 18-1480 (Sept. 16, 2019), Dkt. Nos. 95-96; *id.*, No. 18-1140 (Sept. 16, 2019), Dkt. Nos. 121-22. As a result, the

Second Circuit never rendered a decision on the validity of the "Segal Blend" method. Volpe Decl. ¶ 13.

### C.  Subsequent Communications with AAA

On three occasions in late 2019—October 28, 2019, November 26, 2019, and December 23, 2019—the AAA sent communications to the parties, seeking to determine the status of the matter. Compl. ¶ 66; Kekacs Decl., Ex. B. Neither Defendants, who initiated the arbitration, nor Plaintiffs responded. Compl. ¶¶ 66-67; Kekacs Decl. ¶ 13; Dkt. No. 14 at 8-9; Volpe Decl. ¶ 14. On January 21, 2020 and January 29, 2020, the AAA informed both parties that if the AAA "[did] not hear from either party within seven days[, it] will assume the case is settled and close the file." Kekacs Decl., Ex. C.

Neither party answered AAA's demand for a status update. On February 10, 2020 and February 21, 2020, the AAA informed the parties via email that "inasmuch as [the AAA has] not heard to the contrary, [it] shall assume that this matter is settled and AAA is accordingly closing their file." Kekacs Decl., Ex. D; *see also id.*, Ex. E.

The first communication between the parties since the AAA's correspondence occurred on September 4, 2020 when Plaintiffs sent a draft complaint to Defendants. Kekacs Decl. ¶ 17. Between September 24, 2020 and December 17, 2020, Defendants made no request to re-open the withdrawal liability arbitration, nor did Defendants inform AAA or Plaintiffs that they still intended to pursue arbitration. *Id.* ¶ 19.

## VII.  The Instant Litigation

On November 24, 2020, Plaintiffs filed the Complaint in the instant litigation. The Complaint brings five causes of action: (1) delinquent contributions by Anjost in years 2013 and 2014, 29 U.S.C. §§ 1132, 1145; (2) delinquent contributions by Zaro and Anjost between June 1, 2017 and November 25, 2017, *id.*; (3) Zaro and Anjost's failure to make withdrawal liability

payments, *id.* §§ 1401, 1451; (4) Zaro and Anjost's failure to pay, pursuant to the Rehabilitation

Plan, the difference between the contributions remitted to the Fund at the Preferred Schedule

rates and the amount due retroactively at Default Schedule rates between January 1, 2013 and

May 31, 2017, *id.* §§ 1132, 1145; and (5) equitable relief to enforce Zaro and Anjost's

obligations to provide remittance reports and comply with the Fund's request for audit, *id.*

§ 1132. Compl. ¶¶ 88-112.

On December 17, 2020, Defendants contacted the AAA "to request that [it] lift the stay

of this case and, to the extent AAA has administratively closed its file, to request that AAA re-

open the case." Volpe Decl., Ex. 9. On December 28, 2020, the Fund submitted a letter to the

AAA opposing Defendants' request. Kekacs Decl., Ex. F. The Fund asserted that "[w]hen

[Zaro] abandoned the arbitration proceeding and permitted AAA to close this matter in February

2020, Zaro waived its opportunity to arbitrate." *Id.*

On December 28, 2020, the vice president of the AAA forwarded Defendants' request

and Plaintiffs' opposition to the previously appointed arbitrator. Kekacs Decl., Ex. G. The letter

stated:

> Inasmuch as a request to re-open the . . . matter has been made, we ask that you
> review the parties' positions and provide the [AAA] with your ruling at your earliest
> opportunity. In accordance with Section 32 of the Rules, we confirm the following:
>
> Section 32. REOPENING OF HEARINGS: The hearings may be reopened on the
> Arbitrator's own motion, or upon application of a party at any time before the award
> is made, if the Arbitrator determines that (1) the reopening is likely to result in new
> information that will have a material effect on the outcome of the arbitration; (2)
> good cause exists for the failure of the party that requested reopening to present
> such information at the hearing; and (3) the delay caused by the reopening will not
> be unfairly injurious to any party. The Arbitrator shall have thirty days from the
> closing of the reopened hearings within which to make an award.

*Id.*

On January 20, 2021, the vice president of the AAA emailed the arbitrator's "Ruling on Zaro Bake Shop/Anjost Corporation's Request to Reopen" the matter to Fund and Defendants. Kekacs Decl., Ex. H.  The arbitrator's ruling listed the procedural history of the case and denied Defendants' request to reopen the AAA case file, ruling that Zaro and Anjost "[have] abandoned the case and ha[ve] no basis to reopen it now."  *Id.*, Ex. H.  It said:

> I find there is no reasonable basis to reopen the case at this time.  The Company, the moving party, failed to respond to seven communications from AAA between October 2019 and February 2020, including a number of communications warning the Company that the case would be closed if it did not respond.  After the case was closed, the AAA did not receive any communication from the Company until its letter in December 2020 requesting the case be reopened.
>
> The Company asserts that, since February 21, 2020, the parties have attempted to negotiate a resolution of their dispute.  However, the Fund maintains that the Company did not communicate with it from February 21, 2020 until the Company received a notice that the Fund was preparing to file a draft complaint for a default judgment against it.
>
> I conclude that the Company has abandoned the case and has no basis to reopen it now.  I also note that if the Company, in early 2020, had submitted a unilateral request to hold the case in abeyance from February 2020 through December 2020, I would have rejected that request.  It would make no sense for the Company to be able to obtain the same result by doing nothing for nearly eight months and the merely request reopening the case.

*Id.*

On January 25, 2021, Defendants filed the instant motion to compel arbitration.  Dkt. No. 12.  Plaintiffs filed their opposition on February 16, 2021, Dkt. No. 20, and Defendants filed their reply on March 2, 2021, Dkt. No. 22.  The Court held oral argument on May 18, 2021.

## LEGAL STANDARD

In the absence of any specific provision under the MPPAA, the Court applies the standards applicable to motions to compel under the Federal Arbitration Act ("FAA").  *See* 29 U.S.C. § 1401(b)(3) ("Any arbitration proceedings under this section shall, to the extent consistent with this subchapter, be conducted in the same manner, subject to the same

limitations, carried out with the same powers (including subpoena power), and enforced in United States courts as an arbitration proceeding carried out under title 9.").

Courts apply a standard to a motion to compel arbitration "similar to that applicable for a motion for summary judgment." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (citation omitted). The court will consider "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," and draw all reasonable inferences in favor of the non-moving party. *Id.* (citation omitted). "Where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Id.* (citation omitted).

## DISCUSSION

Defendants move to compel arbitration of the withdrawal liability claim and to stay litigation of the other claims on the basis that they submitted a timely demand for arbitration of the dispute pursuant to 29 U.S.C. § 1401(a)(1) and thus preserved the right to arbitrate. Plaintiffs respond that Defendants' failure to prosecute the arbitration and subsequent abandonment of that proceeding are tantamount to a failure to timely initiate arbitration and thus do not foreclose Plaintiffs' claim for judgment in the full amount of all unpaid withdrawal liability. As to Plaintiffs' remaining claims, Plaintiffs argue that none of these claims is subject to arbitration so that Defendants' timely initiation of an arbitration does not divest the Court of authority to address those claims.

The Court first addresses whether the Fund has standing to pursue the claims alleged in the Complaint. It next turns to whether Plaintiffs can be required to arbitrate the claim for the full withdrawal amount notwithstanding the determination by the arbitrator that Defendants

abandoned the arbitration. It finally addresses whether the remaining ERISA claims are also subject to arbitration.

### A.    Standing

The Court has an independent obligation to examine the standing of the parties before it. The Complaint is brought by both the Fund and by the Trustees. Counts One, Two, Four, and Five are brought under 29 U.S.C. §§ 1132 and 1145, while Count Three is brought under 29 U.S.C. § 1451. The Court concludes that the Fund does not have standing to pursue these counts, but the Trustees do.

The Fund is an employee benefit plan within the meaning of 29 U.S.C. §§ 1002(2)-(3) and is maintained for the purpose of providing retirement and related benefits to eligible employees. It is also a multiemployer pension plan within the meaning of 29 U.S.C. §§ 1002(37)(A) and 1301(a)(3).

Section 1132(d) provides that an "employee benefit plan may sue or be sued under this subchapter as an entity." 29 U.S.C. § 1132(d)(1). But Section 1132(a) enumerates the "[p]ersons empowered to bring a civil action," none of which includes an employee benefit plan. 29 U.S.C. § 1132(a). The Second Circuit has held Section 1132(d) discusses only the "[s]tatus of an employee benefit plan as [an] entity," while Section 1132(a)(3) of ERISA exclusively enumerates the plaintiffs that have standing to sue under ERISA, which is limited to a "participant, beneficiary, or fiduciary." *See Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assur. Co.*, 700 F.2d 889, 891-93 (2d Cir. 1983). It explained:

> Subsection (d)(1) only establishes the right of employee benefit plans created by ERISA to sue and be sued like corporations and other legal entities. Without such a provision a pension plan would not be a legally cognizable body. Affording plans the power to sue does not, however, imply that they may bring actions under

ERISA; it merely authorizes suits to be brought by funds in other situations where there would properly be jurisdiction.

*Id.* at 893 (holding that 29 U.S.C. § 1132(a)(3) does not "authorize a pension fund to assert a cause of action," and therefore "the district court was without subject matter jurisdiction over the Fund's complaint"); *see also Dist. Council 1707 Loc. 389 Home Care Emps.' Pension & Health & Welfare Funds v. Strayhorn*, 2013 WL 1223362, at *5 (S.D.N.Y. Mar. 25, 2013) ("Although '[a]n employee benefit plan may sue . . . as an entity'" under Section 1132(d)(1), "this does not imply that plans may sue as non-enumerated plaintiffs under Section 1132(a), because 'the jurisdictional provisions of ERISA do not on their face authorize a pension fund to assert a cause of action.'") (citation omitted); *see also N.J. Carpenters Annuity Fund v. Meridian Diversified Fund Mgmt., LLC*, 2011 WL 1842772, at *2 (S.D.N.Y. May 11, 2011) ("The funds themselves would have no standing to bring the claims involved here if they were asserted as ERISA claims.").[3]  Instead, "Section 1132(d)(1) authorizes suits *against* funds, as well as suits brought by funds 'in other situations where there would properly be jurisdiction,' such as state contract disputes." *Strayhorn*, 2013 WL 1842772, at *5 (quoting *Pressroom Unions*, 700 F.2d at 893 ("For example, if a fund became involved in a contract dispute, and wished to pursue a state law contract claim, § 1132(d)(1) would allow the fund to bring such an action in its own name.")).

The Fund also does not fall within the other categories under Section 1132(a).  Sections 1132(a)(10) and 1132(a)(11) refer to multiemployer plans but do not give a cause of action to the

---

[3] *See also Bricklayers Ins. Welfare Fund v. Manley Const. Corp.*, 2014 WL 4722754, at *3 (E.D.N.Y. Aug. 13, 2014), *report and recommendation adopted in part*, 2014 WL 4699710 (E.D.N.Y. Sept. 22, 2014) ("Thus, while the Funds can 'sue or be sued' under ERISA, [29 U.S.C.] § 1132(d)(1), they do not fall within the scope of any of the terms used in either subsection (e)(1) or subsection (a)(3) of Section 1132."); *Arch Ins. Co. v. DCM Grp. LLC*, 2012 WL 3887098, at *3 (E.D.N.Y. Aug. 2, 2012), *report and recommendation adopted*, WL 3887654 (E.D.N.Y. Sept. 7, 2012) ("The Funds themselves, although named as plaintiffs, all lacked standing to assert their claims under ERISA.").

plans themselves.  Section 1132(a)(10) permits, "in the case of a multiemployer plan that has

been certified by an actuary to be in endangered or critical status" and where the plan sponsor (in

this case, the Trustees) has not adopted a rehabilitation plan or has failed to update or comply

with the rehabilitation plan, the employer to file suit for an order compelling the plan sponsor to

adopt or comply with the rehabilitation plan.  29 U.S.C. § 1132(a)(10).  Section 1132(a)(11)

permits an "employee representative, or any employer that has an obligation to contribute to the

[multiemployer] plan" to enjoin certain acts or practices or obtain equitable relief to address or

enforce those acts or practices.  29 U.S.C. § 1132(a)(11).

Section 1145 similarly does not confer standing on its own but rather "creates a

substantive right" that an employer be required to make contributions to a multiemployer plan as

specified in the collective bargaining agreement.  *Metal Lathers Loc. 46 Pension Fund v. River

Ave. Contracting Corp.*, 954 F. Supp. 2d 250, 255 (S.D.N.Y. 2013) ("Thus, to the extent that

plaintiffs seek to assert federal question jurisdiction under ERISA, they must fit within the

requirements of § 502(a) and cannot separately look to § 1145.").  Accordingly, the Fund does

not have standing to pursue Counts One, Two, Four, and Five.  *See Pressroom Unions*, 70 F.3d

at 893; *Broach v. Metro. Exposition Servs., Inc.*, 2020 WL 3892509, at *5 (S.D.N.Y. July 10,

2020).

Assuming Count Three is not sent to arbitration, the Fund also would not have standing

to pursue Count Three in federal court.  Count Three is governed by 29 U.S.C. § 1451(a)(1),

which enumerates a "plan fiduciary, employer, plan participant, or beneficiary . . . or an

employee organization" as "persons entitled to maintain actions" under subtitle E, which is

separate from Section 1132.

After the Second Circuit's decision in *Pressroom Unions*, which held that a pension fund could not sue as a "participant, beneficiary, or fiduciary" under 29 U.S.C. § 1132(a)(3), the one court within this Circuit to have faced this issue held that a pension fund could also not bring a withdrawal liability claim and sue as a "plan fiduciary, employer, plan participant, or beneficiary" under 29 U.S.C. § 1451(a)(1) because its language was almost identical to the language in Section 1132(a)(3), notwithstanding the additional term of employer. *See Loc. 807 Lab.-Mgmt. Pension Fund v. Owens Trucking, Inc.*, 585 F. Supp. 616, 617 (E.D.N.Y. 1984) (Weinstein, J.) ("[T]he Fund does not have standing to bring this action under section 1451."); *see also Mut. Life Ins. Co. of N.Y. v. Yampol*, 1986 WL 1426, at *1 (N.D. Ill. Jan. 13, 1986) (noting other courts have allowed pension funds to sue as fiduciaries but that "the Second Circuit has disallowed suits instituted by pension funds"). Section 1401—the arbitration provision of the MPPAA—refers to arbitration of disputes "between an employer and the plan sponsor of a multiemployer plan" and that "either party," but not the multiemployer plan itself, "may initiate the arbitration proceeding." 29 U.S.C. § 1401(a)(1). Similarly, if no arbitration proceeding has been initiated, the "plan sponsor may bring an action in a State of Federal court of competent jurisdiction for collection." *Id.* § 1401(b)(1). According to Plaintiffs, the plan sponsor here is the Trustees, not the Fund.

With the exception of Judge Weinstein's decision in *Owens Trucking*, neither the Supreme Court nor decisions in this Circuit appear to have faced or addressed this issue. In *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Ca.*, 522 U.S. 192 (1997), the trustees of the pension fund were the plaintiffs who filed the action in federal court, which were clearly "fiduciaries" under 29 U.S.C. § 1451(a)(1), and thus there was no issue of standing. *See* Petition for Writ of Certioriari, *id.*, (No. 96-370), 1996 WL 33414088 at *1 (describing the

"Board of Trustees of the Bay Area Laundry and Dry Cleaning Pension Trust Fund" as "the plaintiff"). In *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414 (1995), the employer, not the fund, sought to enforce the award in federal court and as such, there was not an issue as to whether the fund, as respondent, would have standing. Brief for Petitioner, *id.*, (No. 93-768), 1994 WL 440246, at *3 ("[O]n August 29, 1988, the [employer] Respondents field a complaint seeking confirmation of the Arbitrator's Award."). A review of case law in this Circuit in which the MPPAA litigation has included a pension fund as one of the plaintiffs reveals that those decisions have permitted the action to proceed without discussing standing of the pension fund. *See, e.g.*, *ILGWU Nat. Ret. Fund v. Levy Brothers Frocks*, 1987 WL 16149, at *2 (S.D.N.Y. Aug. 21, 1987), *rev'd on other grounds*, 846 F.2d 879 (2d Cir. 1988) (plaintiffs included the pension fund and two individuals who "were trustees of the Fund and had standing to bring this action" without mention of the fund's standing); *Nat'l Ret. Fund v. InterContinental Hotels Grp. Res., LLC*, 2020 WL 1922755, at *2 (S.D.N.Y. Apr. 21, 2020) (plaintiffs included the fund and its trustees); *Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. D & A Bus Co., Inc.*, 270 F. Supp. 3d 593, 602 (E.D.N.Y. 2017) (same).

Although Defendants have not raised a challenge as to the standing of the Fund, as opposed to the Trustees, the Court concludes that a consistent reading of *Pressroom Unions* and 29 U.S.C. § 1132(a)(3) requires it to find that the Fund does not have standing under 29 U.S.C. § 1451(a)(1). This result has little effect on the litigation, however, as the Trustees are a plaintiff in this action, and there is no question that they have standing as "fiduciary" under 29 U.S.C. § 1132(a)(3), "plan fiduciary" under 29 U.S.C. § 1451(a), and "plan sponsor" under 29 U.S.C. § 1401.[4]

---

[4] For the avoidance of confusion, the Court continues to refer to "Plaintiffs" throughout this

## B.    Withdrawal Liability

Defendants argue that the Court should compel the parties to arbitration because they timely initiated arbitration as required by the MPPAA and did not intentionally waive their right to arbitrate when they "inadvertently" failed to respond to the AAA's seven communications sent between October 29, 2019 and February 21, 2020 and sought to restart the arbitration on December 17, 2020 only after Plaintiffs initiated this action on November 24, 2020.  They also argue that if the Court finds the arbitration did not reach a decision on the merits resulting in a final award, the case should proceed to arbitration and they should be able to contest the withdrawal liability amount in the arbitration.[5]

Defendants' argument is inconsistent with the language and structure of the MPPAA and with the statutory purpose of the provision.  Its acceptance also would lead to absurd results.

As an initial matter, it is important to note that the MPPAA's arbitration requirement is not jurisdictional.  *See T.I.M.E.-DC*, 756 F.2d at 945 ("[T]his and other circuits have held that

---

decision.

[5] As a technical matter, though styled as a motion to compel arbitration, Defendants' motion effectively seeks an indefinite stay or dismissal of this action pending arbitration.  The MPPAA does not give the Court the formal power to "compel" arbitration.  The statute thus stands in contrast to the FAA, which Congress referenced in the MPPAA and which it could have followed if Congress intended to give courts the power to compel arbitration.  The FAA provides that a party can bring a motion to compel arbitration.  *See* 9 U.S.C. § 4.  The MPPAA does not. It provides that an arbitration proceeding can be "enforced" in United States courts "as an arbitration proceeding carried out under title 9," but not that a motion can be brought to compel arbitration.  29 U.S.C. § 1401(b)(3).  The Court must presume that Congress's choice of language was knowing and intended.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *Bates v. United States*, 522 U.S. 23, 29 (1997) (where § 1097(d) included an "intent to defraud requirement" but § 1097(a) did not, the Supreme Court declined to "read[ ] words or elements into a statute that do not appear on its face"); *United States v. WB/Stellar IP Owner LLC*, 800 F. Supp. 2d 496, 510 (S.D.N.Y. 2011), *aff'd sub nom. United States v. Glenn Gardens Assocs., L.P.*, 534 F. App'x 17 (2d Cir. 2013) (citing a "contrast" in language as demonstrative that "drafters of the regulation knew precisely how to make agency power discretionary but decided not to do so [in a certain section]").

the arbitration provisions of the MPPAA do not constitute a bar to federal jurisdiction. Rather, the requirement of exhaustion of administrative remedies in this context is a prudential matter within our discretion.") (collecting cases); *Levy Brothers Frocks*, 846 F.2d at 886 ("[T]he arbitration provisions of MPPAA do not constitute an absolute bar to federal jurisdiction, but instead constitute an exhaustion of administrative remedies requirement."); *JLNW, Inc. v. Nat'l Ret. Fund*, 2018 WL 4757953, at *3 (S.D.N.Y. Sept. 28, 2018) ("Defendant provides neither support nor justification for why the requirement of 'completion' would impose a prudential limitation where an arbitration proceeding has not yet taken place, but a jurisdictional one once arbitration has already begun."). The MPPAA grants subject matter jurisdiction to federal courts over disputes involving withdrawal liability under ERISA. *See* 29 U.S.C. § 1451(c) ("The district courts of the United States shall have exclusive jurisdiction of an action under this section without regard to the amount in controversy, except that State courts of competent jurisdiction shall have concurrent jurisdiction over an action brought by a plan fiduciary to collect withdrawal liability.").

The language and structure of the MPPAA also reflects Congress's intent that the plan sponsor's determination of and schedule for withdrawal liability would be considered presumptively correct and that issues regarding the amount of withdrawal liability would be determined and settled speedily by an arbitral tribunal with the federal court having only limited review. That intent is reflected in several provisions. First, an employer seeking to challenge the plan sponsor's schedule and determination of withdrawal liability must do so by initiating arbitration quickly after the plan sponsor's decision on a request for review and if it does not do so, it suffers the consequence that the amounts demanded by the plan sponsor are "due and owing on the schedule set forth by the plan sponsor." *Id.* § 1401(b)(1). Specifically, the

employer must "initiate arbitration . . . within a 60-day period after the earlier of (A) the date of notification to the employer [of the plan sponsor's decision on a request for review] under section 1399(b)(2)(B), or (B) 120 days after the date of the employer's request [for a review of the withdrawal liability] under section 1399(b)(2)(A). *Id.* §1401(a)(1)(A). If it does not do so, the amount of and schedule for withdrawal liability is settled and the plan sponsor (i.e., the Trustees here) may bring an action in court for an order to that effect. Second, the MPPAA establishes the arbitral tribunal as the situs for "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning" the amount of withdrawal liability. *Id.* § 1401(a)(1). Consistent with the general deference courts give to arbitral decisions, the arbitrator's findings of fact are presumed correct and may be rebutted only by clear and convincing evidence. *See id.* § 1401(c). Third, even then, a party seeking to "enforce, vacate or modify the arbitrator's award," must do so without delay. *Id.* § 1401(b)(2). The statute provides that such an action may be brought "no later than 30 days after the issuance of an arbitrator's award." *Id.*

These provisions reflect Congress's intent "that disputes over withdrawal liability would be resolved quickly, and establish[] a procedural bar for employers who fail to arbitrate disputes over withdrawal liability in a timely manner." *Levy Brothers Frock*s, 846 F.2d at 887 (citing 29 U.S.C. § 1401(b)(1)). The "value of arbitration in fulfilling Congress' intent to provide an efficient, expeditious dispute resolution mechanism lies in *initial* resort to that mechanism." *I.A.M. Nat'l Pension Fund, Plan A, A Benefits v. Clinton Engines Corp.*, 825 F.2d 415, 427 (D.C. Cir. 1987). As noted above, in passing the MPPAA, Congress was confronted with the risk to the financial stability of the country's pension system created when an employer withdraws from an underfunded multiemployer plan. It requires the employer to pay a charge sufficient to cover

that employer's fair share of the plan's unfunded liabilities. *See Milwaukee Brewery*, 513 U.S. at 415. The MPPAA's provisions reflect Congress's recognition that multiemployer plans need finality in the determination of the amount of withdrawal liability to be financially responsible and that without a means for the quick and final settlement of the sum of and schedule for withdrawal liability, the mere provisional determination by the plan sponsor of an amount of withdrawal liability would not address the threat to the country's pension system.

It follows both from the MPPAA's plain language and from the function it performs in the statutory scheme, that the obligation of an employer who seeks to challenge the plan sponsor's plan to "initiate arbitration" within 60 days of the notification of a decision on the request for review carries with it an obligation to prosecute the arbitration. To "initiate" is "to begin, commence [a process]." Oxford English Online Dictionary, https://www.oed.com/view/Entry/96066?rskey=EEXvL6&result=2#eid (last visited June 8, 2021); *see* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/initiate?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited June 8, 2021) (defining "initiate" as "to cause or facilitate the beginning of [a process]"). It reflects the start of a process and not a terminal point. Here, the process is the arbitration. Defendants do not dispute that if they filed a claim in arbitration but failed to pay a filing fee or notify the plan sponsor of the arbitration, that would not constitute an "initiation" sufficient to forestall the final settlement of the amount of withdrawal liability. The filing of the claim in arbitration is one component of the initiation of an arbitration; it would frustrate the MPPAA and be inconsistent with congressional objectives if an employer could delay the final settlement of the amount of withdrawal liability for an indefinite period by the mere expedient of sending a claim to the arbitrator without taking sufficient action to ensure that the issues the employer sought to raise were in fact adjudicated.

The same logic demonstrates that the filing of a claim in arbitration here, followed by Defendants' failure to prosecute their action and decision to abandon the arbitration, cannot act to prevent Plaintiffs from having the amount of and schedule for withdrawal liability finally determined. If it were otherwise, an employer who found that it was losing the arbitration (or who launched the arbitration knowing it would lose) would have a ready solution to the threat that Plaintiffs could obtain a final order or award. The employer could simply walk away and cause Plaintiffs to be placed in a steady and interminable state of uncertainty—they would have a liability determination by the plan sponsor in place, but be unable to reduce that liability to an arbitral award and eventual court judgment that could be relied upon on the theory that, while the employer never intended to finish the process, it at least began the process.

Defendants protest, of course, that they did not abandon the arbitration and that they do not fall into the category of those who would begin something never intending to complete it. Here, however, they run into a separate factual and statutory problem. Defendants challenged the arbitrator's decision to close their case and the arbitrator found that that Defendants "ha[ve] abandoned the case and ha[ve] no basis to reopen it now." Kekacs Decl., Ex. H. In so doing, the arbitrator followed the AAA's Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes ("MPPAA Rules"), which provide the procedures through which arbitration concerning the MPPAA in front of the AAA may proceed. Section 32 of the MPPAA Rules states that the arbitrator can reopen a hearing if it "determines that (1) the reopening is likely to result in new information that will have a material effect on the outcome of the arbitration; (2) good cause exists for the failure of the party that requested reopening to present such information at the hearing; and (3) the delay caused by the reopening will not be unfairly injurious to any party." This rule was cited by the AAA vice president in her email to the arbitrator that sent the

parties' competing letters to the arbitrator and asked for a "ruling" on the request to reopen. Kekacs Decl., Ex. G. After reviewing the parties' submissions and concluding that Defendants had "abandoned the case," the arbitrator further added that "if the [Defendants], in early 2020, had submitted a unilateral request to hold the case in abeyance from February 2020 through December 2020, [the arbitrator] would have rejected that request." Kekacs Decl., Ex. H. Although not mouthing the language of "good cause," it is plain that the arbitrator applied the standard. He stated "[i]t would make no sense for the Company to be able to obtain the same result by doing nothing for nearly eight months and the merely request reopening the case." *Id.* The arbitrator determined that the case was abandoned and should remain "closed." *Id.*

As a general matter, in all areas of arbitration law, the court gives deference to an arbitrator's application of the procedural rules of the arbitral tribunal including "allegation[s] of waiver, delay, or a like defense to arbitrability." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). "[A]rbitrators, comparatively more expert about their own rule's meaning, are comparatively better able to interpret and to apply it" and "it is reasonable . . . for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy—a goal of arbitration systems and judicial systems alike." *Id.* at 85; *see, e.g.*, *Dominguez v. Miller*, 2013 WL 703193, at *9 (E.D.N.Y. Jan. 18, 2013) ("[A]n arbitrator's decision with respect to procedural matters such as whether to reopen a hearing . . . is a discretionary decision entitled to considerable deference by a district court.") (quoting *Kaplan v. Alfred Dunhill of London Inc.*, 1996 WL 640901, at *6 (S.D.N.Y. Nov. 4, 1996)); *see also Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) ("Federal courts do not superintend arbitration proceedings. Our

review is restricted to determining whether the procedure was fundamentally unfair.") (citation omitted). "Procedural rulings can only lead to vacating an award if the ruling denied the petitioner 'fundamental fairness,'" and an "arbitrator 'is not required to hear all the evidence proffered by a party,' but 'must give each of the parties to a dispute an adequate opportunity to present its evidence and argument.'" *Landmark Ventures, Inc. v. InSightec, Ltd.*, 63 F. Supp. 3d 343, 352 (S.D.N.Y. 2014), *aff'd*, 619 F. App'x 37 (2d Cir. 2015) (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 107 (2d Cir. 2013)). Defendants have offered no reason here to think that the arbitrator's application of the MPPAA Rules was anything other than reasonable and fair. *See, e.g.*, *id.* at 353 ("Arbitrator was empowered to enforce the deadlines and did not commit misconduct by doing so" where party failed to "compl[y] with the procedural rules of the arbitration," "repeatedly missed deadlines," and "filed improper, untimely requests even after being given a second chance to comply"); *Com. Risk Reinsurance Co. v. Sec. Ins. Co. of Hartford*, 526 F. Supp. 2d 424, 429 (S.D.N.Y. 2007) (finding "no justification for going behind the arbitrators' interpretation and application of their procedural mandate"). Defendants had the opportunity to present their case, but the arbitrator concluded they abandoned that opportunity.

There is no reason to think that Congress intended the Court to give less weight to arbitrators' determination here, especially where the MPPAA requires that the arbitrator's findings of fact are presumed correct rebutted only by clear and convincing evidence. *See* 29 U.S.C. § 1401(c); *see also Acciardo v. Millennium Sec. Corp.*, 83 F. Supp. 2d 413, 417 (S.D.N.Y. 2000) ("[T]he Court is not empowered to second-guess the arbitrators' fact-finding or assessment of credibility. A district court must accept findings of fact if they are not clearly erroneous.") (citing *Int'l Brotherhood of Elec. Workers v. Niagara Mohawk Power Corp.*, 143

F.3d 704, 706, 725-26 (2d Cir. 1998)). Significantly, Defendants point to no error or anything that the arbitrator missed in his decision or claim that there were additional facts they failed to bring to his attention. The arbitrator's determination that good cause had not been established so as to reopen the hearings, and that the arbitration had been abandoned, was a "matter[] of procedure [] best left to the arbitrators themselves." *Convergia Networks, Inc. v. Huawei Techs. Co.*, 2008 WL 4787503, at *4 n.4 (S.D.N.Y. Oct. 30, 2008); *see Com. Risk Reinsurance Co.*, 526 F. Supp. 2d at 430 (noting "deference due to [arbitrators'] rulings on such procedural matters"); *Kruse v. Sand Brothers & Co.*, 226 F. Supp. 2d 484, 488 (S.D.N.Y. 2002) ("[G]reat deference [is] given to [an] arbitrator's decision to control order, procedure and presentation of evidence."). To find otherwise would "constitute an open invitation for courts either to second guess arbitrators' reading and application of the scope of their procedural rules, or to compel them, against the explicit mandate of applicable arbitration doctrine, to articulate detailed explanations for any disputed procedural ruling." *Com. Risk Reinsurance Co.*, 526 F. Supp. 2d at 429.

Moreover, even if the Court were to review the arbitrator's ruling de novo, it would find no basis for reversal. "Parties must abide by an arbitral panel's reasonable interpretation of the rules governing arbitration when the parties have" agreed to abide by those rules in arbitration. *Ecopetrol S.A. v. Offshore Expl. & Prod. LLC*, 46 F. Supp. 3d 327, 344 (S.D.N.Y. 2014); *see I Appel Corp. v. Katz*, 2005 WL 2995387, at *6 (S.D.N.Y. Nov. 9, 2005), *aff'd sub nom. Appel Corp. v. Katz*, 217 F. App'x 3, 4 (2d Cir. 2007) (summary order) (district court "properly deferred" to arbitral panel's interpretation of its own rules because panel was vested with authority to interpret and apply its own rules).

Defendants place weight on the fact that both parties jointly requested a stay of the arbitration and that Plaintiffs also failed to respond to the requests for status updates from the

AAA, arguing that Plaintiffs bear "equal and commensurate" responsibility for "inaction" in responding to AAA's communications. Dkt. No. 22 at 4. However, Plaintiffs did not have a responsibility to initiate and prosecute the arbitration; it was Defendants, and not Plaintiffs, who were challenging the plan sponsor's determination and seeking relief from the arbitrator. *See Rao v. Prest Metals*, 149 F. Supp. 2d 1, 8-9 (E.D.N.Y. 2001) ("The MPPAA clearly allows either party to make the request for arbitration, and nothing in the statute indicates that once one party expresses an interest in arbitration, the other is under a duty to commence such a proceeding."). There is no allegation or evidence that Plaintiffs lulled Defendants into not responding or took any action that could give rise to a claim of equitable estoppel. Absent orders from the arbitrator, Plaintiffs had no responsibility to move along an arbitration they did not initiate in the first place or did not even want to pursue. *Cf. Sacco v. Orange Cty. Jail*, 1994 WL 665038, at *1 (S.D.N.Y. Nov. 23, 1994) (stating that the initiating party "has a responsibility to prosecute his case") (citing *Link v. Wabash Road Co.*, 370 U.S. 626, 6233 (1962)). Indeed, in *Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp.*, 938 F. Supp. 2d 361, 367 (E.D.N.Y. 2013), the court found that the employer had abandoned the arbitration when both parties failed to respond after the AAA requested a status update from the parties and warned that the file would be closed.

Finally, Defendants' argument is fundamentally inconsistent with the statutory purpose of the MPPAA and could lead to absurd results. *Cf. Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 705–06 (2d Cir. 2019) ("[C]ourts should look beyond a statute's text under the canon against absurdity only where the result of applying the plain language would be, in a genuine sense, absurd, i.e., where it is quite impossible that Congress could have intended the result and where the alleged absurdity is so clear as to be obvious to most anyone.") (citations and internal

quotation marks omitted). The central motive behind Congress' enactment of MPPAA was to disincentivize "employer withdrawals [that] posed a serious threat to the overall stability of [multiemployer] plans by burdening those employers that remained." *Textile Workers Pension Fund v. Standard Dye & Finishing Co., Inc.*, 725 F.2d 843, 848 (2d Cir. 1984). The requirement of immediate arbitration is a reflection of such policy. *See Bowers v. Compania Peruana De Vapores, S.A.*, 689 F. Supp. 215, 219 (S.D.N.Y. 1998) ("This court is mindful of Congress' arbitration plan and its concern that pension plans not go unfunded for long.").

Under Defendants' interpretation of the MPPAA, a recalcitrant employer could obtain, through delay, relief from settlement of the full amount of withdrawal liability that it could not obtain on the merits. The employer could also prevent the plan from getting the final determination to which it is entitled. The MPPAA provides that the plan sponsor may proceed to court to enforce collection if a party does not initiate arbitration within the 60-day period. *See* 29 U.S.C. §§ 1401(a)(1), (b)(1). But if the employer initiates arbitration and then could forestall final settlement by doing nothing, "Congress' plan for arbitration of withdrawal liability and thus the speedy resolution of disputes" would become meaningless. *Bowers*, 689 F. Supp. at 219; *see Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) ("[W]e must 'construct an interpretation that comports with [the statute's] primary purpose and does not lead to anomalous or unreasonable results.'") (quoting *Connecticut v. U.S. Dep't of the Interior*, 228 F.3d 82, 89 (2d Cir. 2000)).

It would also lead to a constant game of whack-a-mole. If Defendants' argument is right—that after they are deemed by the arbitrator to have abandoned the arbitration, they can nonetheless initiate another arbitration—an employer could forever delay a determination on the merits. It could file an arbitration, delay for months or years until an arbitrator eventually

determines that there has been abandonment, file a second arbitration, delay that arbitration, and repeat the cycle over. The congressional objective of a speedy determination of withdrawal liability upon which the fiscal stability of multiemployer plans depends would be thwarted. *See, e.g.*, *Levy Brothers Frock*s, 846 F.2d at 887; *Clinton Engines Corp.*, 825 F.2d at 427. It also gives rise to equally unpalatable conclusion, that a district court could order a private arbitration organization, which has already closed a matter, to reopen it.

The point is highlighted by Defendants' answer to the question of how, in light of the arbitrator's decision to close the arbitration, Plaintiffs could proceed to obtain final settlement now. Defendants offered two alternatives: (1) Defendants could open a new arbitration proceeding or (2) Plaintiff could seek an award in the presently closed action. Neither is tenable and the challenges with each demonstrate the flaws in Defendants' argument.

Defendants do not have a right to a second arbitration. They had a right to the first arbitration—the one the arbitrator concluded they abandoned. They were obligated to bring their challenge to the determination of withdrawal liability within 60 days of Plaintiffs' July 24, 2018 notification of their decision on Defendants' request for review, on September 22, 2018. Volpe Decl. ¶ 3. Any request now to initiate a new arbitration proceeding would be after that deadline and untimely, and Defendants' ability to initiate a new arbitration proceeding has thus been waived. *See, e.g.*, *Bowers v. Greenpoint Warehousing & Distribution Servs., Inc.*, 1992 WL 110756, at *2 (S.D.N.Y. May 5, 1992) ("Failure to initiate arbitration within the statutory time period operates as a waiver of arbitration, thereby fixing the withdrawal liability and foreclosing any challenge to its imposition."); *see also Bowers v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 263 (2d Cir. 1990) (stating that "[a]ssuming [employer] did not waive its right to seek arbitration, the dispositive issue is whether it is entitled to arbitration now that the time

within which to seek arbitration has expired" and holding that it was not so entitled, under either the MPPAA or equitable tolling principles). An order requiring Plaintiffs to arbitrate now would compel the very delay and whack-a-mole process Congress sought to avoid through the MPPAA.

Defendants also offered that Plaintiffs could seek an "award" in the presently closed action and then if Plaintiffs are successful, they could go to federal court for an order settling withdrawal liability. But, as Defendants ultimately admitted, that answer is no answer at all. It would relegate Plaintiffs to the same purgatory in which Defendants' current motion seeks to place them. There is no pending action in which Plaintiffs could ask for an award—the AAA closed the file and the arbitrator issued a ruling in which he declined to reopen it. In essence, then, Defendants would have the Plaintiffs wait for a moment that Defendants know will never arrive.

The Court's result here is consistent with the cases under the FAA holding that an employer's failure to pay a filing fee and to respond to the arbitrating body's communications such that the arbitrating body terminates the case renders the employer in default of arbitration proceedings. *See, e.g.*, *Polit v. Glob. Foods Int'l Corp.*, 2016 WL 632251, at *2 (S.D.N.Y. Feb. 17, 2016) (AAA "assume[d] th[e] matter [was] settled" and closed the case after employer failed to pay arbitrator fees and did not respond to communication); *Spano v. V & J Nat'l Enters., LLC*, 264 F. Supp. 3d 440, 446-47, 459 (W.D.N.Y. 2017) (AAA terminated proceeding when employer failed to pay filing fee despite at least five reminders).

The rationale behind these decisions is that if the party not responding to the AAA or not paying the required fees is later permitted to pursue arbitration, that "party refusing to cooperate with arbitration [could] indefinitely postpone litigation." *Sink v. Aden Enters., Inc.*, 352 F.3d 1197, 1201 (9th Cir. 2003). The Court finds this rationale applicable to the instant matter. "The

AAA's refusal to arbitrate [the parties'] claims means that the [parties] cannot prosecute their claims in accordance with the arbitration agreements." *Gomez v. MLB Enters., Corp.*, 2018 WL 3019102, at *12 (S.D.N.Y. June 5, 2018) (recognizing that "Plaintiffs cannot bring claims to the AAA, because the AAA has already dismissed two cases due to Defendants' failure to abide by its rules and has announced prospectively that it will not arbitrate any employment-related claims for Defendants"); *see also Three S Del., Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 531 (4th Cir. 2007) (arbitrator did not commit misconduct when it "ultimately declined to reopen and hear [party]'s evidence" because the party "was not deprived of a fundamentally fair hearing" as it "would have had an ample opportunity to present its evidence if its owner had not insisted on abandoning the arbitration hearing"); *id.* ("[T]he arbitrator, under the AAA rules, was vested with broad discretion . . . and was not obliged to reopen the hearing in any event.").

This result is also consistent with other cases dealing with the timely initiation of arbitration under the MPPAA and the possibility of subsequent waiver. In *Trustees of Local 531 Pension Fund v. Al Turi Landfill, Inc.*, 2010 WL 11627389, at *6 (E.D.N.Y. Sept. 20, 2010), the court referred the matter to arbitration after it had been timely initiated but held in abeyance by the AAA while the parties pursued settlement. The court granted the motion to compel because it found "nothing in the record or the AAA rules to definitively show that the arbitration, last adjourned in 2003, was in fact closed by the AAA with prejudice to either party" and barring that evidence, it could not "find on the current record that defendant ha[d] waived its right to arbitration." *Id.* at *6. However, the court noted, "this finding would not preclude the arbitrator from making a determination that defendant waived its arbitration rights under internal AAA rules." *Id.*; *see Howsam*, 537 U.S. at 85 ("[T]he presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.'") (citation omitted). Here, there

is evidence in the record that clearly shows the arbitration "was in fact closed by the AAA" and was done so "with prejudice" to Defendants.[6]

## C.    Other ERISA Claims

Plaintiffs argue independently that arbitration should not be compelled for Counts One, Two, Four, and Five.  *See* Dkt. No. 20 at 7-8.

There is no dispute that the Court has subject matter jurisdiction over Counts One, Two, Four, and Five under 29 U.S.C. §§ 1132 and 1145.  *See, e.g.*, *Trs. of the Drywall Tapers and Pointers Loc. Union No. 1974 Benefit Funds v. Plus K Constr. Inc.*, 2021 WL 1199566, at *2 (S.D.N.Y. Mar. 30, 2021) (stating that a "[c]ourt has subject matter jurisdiction under Sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145").  Section 1132(f) provides that "[t]he district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action."  29 U.S.C. § 1132(f); *see also* 29 U.S.C. § 1132(e)(2) (providing for "exclusive jurisdiction").  The Trustees seek relief under 29 U.S.C. § 1132(a)(3) for Counts One, Two, Four, and Five.  Under Section 1132(a)(3), "a civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable

---

[6] This result is also consistent with the outcome in the cases relied upon by Plaintiffs, although those cases faced different challenges from the party seeking to arbitrate.  In *Dunhill*, 938 F. Supp. 2d at 367, the court held that, after timely initiating arbitration, the employer abandoned arbitration when the parties failed to respond to the AAA's request for a status update and the AAA notified the parties that the arbitration file had been closed.  However, there, the employer did not challenge this abandonment argument.  In *Central States, Southeast & Southwest Areas Pension Fund v. Frate Service, Inc.*, 2017 WL 8792690, at *2 (N.D. Ill. Nov. 14, 2017), the court held that the employer "failed to complete the arbitration process" after it initiated arbitration but did not pay the full AAA filing fee.  But there, the employer argued that it never received a proper notice and demand for its withdrawal liability so that its duty to arbitrate was never triggered.

relief (i) to redress such violations or (ii) to *enforce any provisions of this subchapter or the terms of the plan*." 29 U.S.C. § 1132(a)(3) (emphasis added).

The MPPAA is clear that it compels arbitration of only disputes concerning withdrawal liability: "Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1). Those statutory sections relate only to withdrawal liability and do not require arbitration of the other claims at issue here. Defendants also have not identified an independent statutory provision that would require arbitration of Counts One, Two, Four, and Five. In the absence of any argument or response by Defendants as to whether these claims should be arbitrated, the Court deems this issue abandoned. *See Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 206 n.6 (S.D.N.Y. 2020) ("Arguments not raised in a party's brief are deemed waived."); *see also Kosachuk v. Selective Advisors Grp., LLC*, 827 F. App'x 58, 62 (2d Cir. 2020) (argument waived when appellant raised argument for the first time during oral argument and failed to raise it in his briefs).

**CONCLUSION**

The motion to compel arbitration is DENIED. The Clerk of Court is respectfully directed to close Dkt. No. 12.

The parties are instructed to submit a proposed joint case management plan and scheduling order by June 22, 2021. An initial pretrial conference is scheduled for June 29, 2021 at 3:00 p.m. Parties are directed to dial into the Court's teleconference line at 1-888-251-2909, Access Code 2123101, and follow the necessary prompts.

SO ORDERED.

Dated: June 8, 2021
      New York, New York

LEWIS J. LIMAN
United States District Judge